## EXHIBIT A

## FOURTH AMENDED JOINT PLAN OF THE DEBTOR UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AND MODIFICATIONS THERETO

NYI-2137314v9
WP3:1011573.5

58241.1001

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

IN RE: :

GLOBALSTAR CAPITAL CORPORATION, : Jointly Administered
    a Delaware corporation, et al., : Case No. 02-10499 (PJW)

         Debtors. : Chapter 11

| | |
|---|---|
| (GLOBALSTAR CAPITAL CORPORATION) | : (Case No. 02-10499 (PJW)) |
| (GLOBALSTAR SERVICES COMPANY, INC.) | : (Case No. 02-10501 (PJW)) |
| (GLOBALSTAR (DEBTOR), LLC) | : (Case No. 02-10503 (PJW)) |
| (GLOBALSTAR, L.P.) | : (Case No. 02-10504 (PJW)) |

    : **DEBTORS' FIRST MODIFIED FOURTH**
    : **AMENDED JOINT PLAN UNDER CHAPTER 11**
    : **OF THE BANKRUPTCY CODE**

Brendan Linehan Shannon (No. 3136)
M. Blake Cleary (No. 3614)
YOUNG CONAWAY STARGATT & TAYLOR LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19899
(302) 571-6600

- and -

Paul D. Leake
Scott J. Friedman
JONES DAY
222 E. 41st Street
New York, NY 10017
(212) 326-3939

ATTORNEYS FOR DEBTORS AND DEBTORS IN
POSSESSION

June 17, 2004

# TABLE OF CONTENTS

ARTICLE I.    DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME ........... 1

    A.    Defined Terms ..................................................................................................................... 1

    B.    Rules of Interpretation and Computation of Time ........................................................... 12

        1.    Rules of Interpretation ......................................................................................... 12

        2.    Computation of Time ........................................................................................... 12

ARTICLE II.    CLASSES OF CLAIMS AND INTERESTS ............................................................. 12

ARTICLE III.    TREATMENT OF CLAIMS AND INTERESTS ...................................................... 13

    A.    Unclassified Claims ........................................................................................................ 13

        1.    Payment of Administrative Claims ..................................................................... 13

        2.    Payment of Priority Tax Claims .......................................................................... 14

    B.    Classified Claims and Interests ...................................................................................... 14

        1.    Class 1 (Priority Claims) are unimpaired ........................................................... 14

        2.    Class 2 (Secured Claims) are unimpaired. .......................................................... 14

        3.    Class 3 Claims (Convenience Claims) are impaired ........................................... 15

        4.    Class 4 Claims (General Unsecured Claims) are impaired ................................. 15

        5.    Class 5 Claims (Loral Claims) are impaired ....................................................... 16

        6.    Class 6 Claims (Insured Claims) are unimpaired ................................................ 16

        7.    Class 7 Claims (Securities Litigation Claims) are impaired ............................... 16

        8.    Class 8 Interests (Interests) are impaired ........................................................... 16

ARTICLE IV.    MEANS FOR IMPLEMENTATION OF THE PLAN ............................................... 17

    A.    Implementation of the Plan ............................................................................................. 17

        1.    Dissolution of the Debtors ................................................................................... 17

        2.    Disposition of the GSH Interest .......................................................................... 18

        3.    Accounts .............................................................................................................. 18

        4.    Transfer of Remaining Cash to New Globalstar ................................................. 18

        5.    Assignment of GlobalTel C.J.S.C. Interest ......................................................... 18

    B.    Preservation of Rights of Action; New Globalstar as Estate Representative .................. 18

    C.    Termination of Certain Employee, Retiree and Workers' Compensation Benefits......... 19

        1.    Employee Benefits ............................................................................................... 19

        2.    Retiree Benefits ................................................................................................... 19

        3.    Workers' Compensation Benefits ........................................................................ 19

    D.    Cancellation and Surrender of Instruments, Securities and Other Documentation ........ 19

    E.    Release of Liens .............................................................................................................. 20

    F.    Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes ........... 20

ARTICLE V.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...................... 20

| | | | |
|---|---|---|---|
| A. | Rejection of Executory Contracts and Unexpired Leases Generally | | 20 |
| B. | Approval of Rejection of Executory Contracts and Unexpired Leases | | 20 |
| C. | Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan | | 20 |
| ARTICLE VI. | PROVISIONS GOVERNING DISTRIBUTIONS | | 21 |
| A. | Distributions for Claims or Interests Allowed as of the Effective Date | | 21 |
| B. | Method of Distributions to Holders of Claims and Interests | | 21 |
| C. | Compensation and Reimbursement for Services Related to Distributions | | 22 |
| D. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | | 22 |
| | 1. | Delivery of Distributions | 22 |
| | 2. | Undeliverable Distributions Held by Disbursing Agents | 24 |
| E. | Distributions to Holders of Record on the Distribution Record Date | | 25 |
| F. | Means of Cash Payments | | 25 |
| G. | Timing and Calculation of Amounts To Be Distributed | | 25 |
| | 1. | Business Day | 25 |
| | 2. | Rounding | 26 |
| | 3. | Compliance with Tax Requirements | 26 |
| H. | Setoffs | | 26 |
| I. | Surrender of Canceled Instruments or Securities | | 26 |
| | 1. | Tender of Senior Note Certificates | 26 |
| | 2. | Lost, Stolen, Mutilated or Destroyed Senior Notes Certificate | 27 |
| | 3. | Failure to Surrender Senior Note Certificates | 27 |
| | 4. | Senior Note Certificates in the Name and Custody of CEDE & Co | 27 |
| | 5. | Senior Note Certificates in the Name, but not the Custody, of CEDE & Co | 27 |
| | 6. | Uncertificated Senior Notes in the Name of CEDE & Co | 27 |
| | 7. | Note Certificates Other Than Senior Note Certificates, Stock Certificates, Instruments and Other Written Documents | 27 |
| | 8. | Limitation on Distributions in respect of Senior Notes held in the name of CEDE & Co | 28 |
| ARTICLE VII. | PROCEDURES FOR RESOLVING DISPUTED CLAIMS UNDER THIS PLAN | | 28 |
| A. | Prosecution of Objections | | 28 |
| B. | No Distributions Pending Allowance | | 28 |
| C. | Disputed Claims Reserve | | 28 |
| | 1. | Creation of the Disputed Claims Reserve; Initial Distribution | 28 |
| | 2. | Distribution After Allowance or Disallowance of Claims | 29 |
| | 3. | Additional Distributions on Account of Previously Allowed Claims | 29 |

| | 4. | Additional Provisions for Distribution of Standard Release-Based Consideration and Supplemental Release-Based Consideration | 30 |
|---|---|---|---|
| | 5. | Estimation | 30 |
| | 6. | Dividends and Distributions | 30 |
| | 7. | Recourse | 31 |
| | 8. | Tax Reporting and Other Matters | 31 |
| ARTICLE VIII. | | EXERCISE OF RIGHTS TO ACQUIRE ADDITIONAL MEMBERSHIP INTERESTS | 32 |
| A. | | Procedures for Exercise of Series A Rights by Undisputed Holders | 32 |
| B. | | Procedures for Exercise of Series B Rights by Undisputed Holders | 33 |
| C. | | Procedures For Exercise of Series A Rights and Series B Rights by Holders of Disputed General Unsecured Claims as of the Rights Expiration Time | 35 |
| | 1. | Exercise of Series A Rights | 35 |
| | 2. | Exercise of Series B Rights | 36 |
| ARTICLE IX. | | SUBSTANTIVE CONSOLIDATION OF THE DEBTORS | 37 |
| ARTICLE X. | | CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN | 38 |
| A. | | Conditions to Confirmation | 38 |
| B. | | Conditions to the Effective Date | 38 |
| C. | | Waiver of Conditions to the Confirmation and Effective Date | 38 |
| D. | | Effect of Nonoccurrence of Conditions to the Effective Date | 38 |
| ARTICLE XI. | | CRAMDOWN | 39 |
| ARTICLE XII. | | INJUNCTION AND RELEASES | 39 |
| A. | | General Releases by the Non-Debtor Subsidiaries and Holders of Claims Against and Interests in the Debtors of the Debtors, the Non-Debtor Subsidiaries, New Globalstar and its subsidiaries, the Creditors Committee, GTL, and Representatives of the Foregoing | 39 |
| B. | | General Releases by Non-Debtor Subsidiaries and Holders of Claims Against and Interests in the Debtors of the Loral Entities and General Partners Committee Releasees | 39 |
| C. | | General Releases by Non-Debtor Subsidiaries and Holders of Claims Against and Interests in the Debtors of the QUALCOMM Entities and Related Parties | 40 |
| D. | | General Releases by Non-Debtor Subsidiaries and Holders of Claims Against and Interests in the Debtors of the GP Debtors | 40 |
| E. | | Release by the Debtors of their Representatives, the Creditors Committee and its Representatives, the Loral Entities and their Representatives, the General Partners Committee Members, the GP Debtors, and QUALCOMM and its Representatives | 40 |
| F. | | Exculpation | 41 |
| G. | | Injunction And Stays | 41 |
| | 1. | General Injunction Related To Parties Released Pursuant to Plan | 41 |
| | 2. | Injunction Relating to New Globalstar | 42 |

|   |   |   |   |
|---|---|---|---|
|   | 3. | Continuation of Stays and Injunctions | 42 |
|   | 4. | Consent to Injunctions | 42 |
|   | 5. | Indemnity | 42 |
| H. |   | Termination of Subordination Rights and Settlement of Related Claims and Controversies | 43 |
| ARTICLE XIII. |   | RETENTION OF JURISDICTION | 43 |
| ARTICLE XIV. |   | MISCELLANEOUS PROVISIONS | 44 |
| A. |   | Dissolution of the Creditors Committee | 44 |
| B. |   | Modification of the Plan | 44 |
| C. |   | Revocation of the Plan | 45 |
| D. |   | Severability of Plan Provisions | 45 |
| E. |   | Successors and Assigns | 45 |
| F. |   | Applicability of Section 1145 | 45 |
| G. |   | Service of Documents | 46 |

WP3:998520.5                                                              61600 1001

# INTRODUCTION

Globalstar, L.P., Globalstar Capital Corporation, Globalstar Services Company, Inc., and Globalstar (Debtor), LLC f/k/a Globalstar, L.L.C., propose the following joint plan of liquidation (the "Plan") for the resolution of the outstanding claims against and interests in the Debtors (as hereinafter defined). Reference is made to the Disclosure Statement (as hereinafter defined), filed contemporaneously with the Plan, for a discussion of the Debtors' history, businesses, results of operations, historical financial information and properties, and for a summary and analysis of the Plan. There also are other agreements and documents, which are or will be filed with the Bankruptcy Court, that are referenced in the Plan or the Disclosure Statement and that will be available for review.

The Plan is a joint plan of liquidation and provides that the Debtors' chapter 11 cases will be substantively consolidated. Accordingly, and except as expressly provided for herein, all provisions of the Plan, including the definitions and distributions to creditors, shall apply to the assets and claims of the consolidated bankruptcy estates of the Debtors.

## ARTICLE I.  DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME

### A.  Defined Terms

As used in the Plan, capitalized terms have the meanings set forth below. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, will have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.  **"Administrative Claim"** means any right to payment constituting a cost or expense of administration of the Chapter 11 Cases under sections 503(b) and 507(a)(1) of the Bankruptcy Code, including (a) any actual and necessary costs and expenses of preserving the Estates of the Debtors, (b) any actual and necessary costs and expenses of operating the businesses of the Debtors, (c) any indebtedness or obligations incurred or assumed by the Debtors in Possession in connection with the conduct of their business or for the acquisition or lease of their properties, including intercompany obligations accorded priority pursuant to an order of the Bankruptcy Court, (d) any allowances of compensation and reimbursement of expenses to the extent allowed by Final Order under section 330 or 503 of the Bankruptcy Code, whether fixed before or after the Effective Date, (e) any fees or charges assessed against the Estate under section 1930, chapter 123, title 28, United States Code, including any post-Confirmation Date and post-Effective Date fees and charges, and (f) any claims treated as Administrative Claims in accordance with this Plan.

2.  **"Agent"** means Blue River Capital, LLC, it its capacity as administrative agent for the Creditor DIP Lenders.

3.  **"Aggregate Membership Interest"** means 100% of the Membership Interests of New Globalstar.

4.  **"Allowed"** means, with reference to any Claim, any

    a.    Claim that (i) has been listed by a particular Debtor on its Schedules as other than disputed, contingent or unliquidated, and (ii) is not otherwise a Disputed Claim;

    b.    Claim (i) for which a proof of Claim or request for payment of Administrative Claim has been filed by the applicable bar date or otherwise been deemed timely filed under applicable law, and (ii) that is not otherwise a Disputed Claim; or

c. Claim that is allowed: (i) in any stipulation or agreement executed by the applicable Debtor and the applicable Claim holder on or after the Effective Date establishing the amount and nature of the Claim; (ii) in any contract, instrument or other agreement entered into in connection with the Plan and, if prior to the Effective Date, approved by the Bankruptcy Court; (iii) in a Final Order; or (iv) pursuant to the terms of the Plan.

5. **"Asset Contribution Agreement"** means the Asset Contribution Agreement by and among GLP, New Globalstar, Thermo and certain of their affiliates dated December 5, 2003, as amended, filed (without certain exhibits) with the Bankruptcy Court on April 28, 2004.

6. **"Ballot"** means the form or forms distributed to each holder of an impaired Claim entitled to vote on the Plan on which the holder indicates acceptance or rejection of the Plan and any election for treatment of such Claim under the Plan, if applicable.

7. **"Bankruptcy Code"** means title 11 of the United States Code, as now in effect or hereafter amended.

8. **"Bankruptcy Court"** means the United States District Court for the District of Delaware having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made pursuant to 28 U.S.C. § 157, the bankruptcy unit of such District Court.

9. **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended.

10. **"Base Creditor Membership Interest"** means 18.2612% (subject to reduction as a result of QUALCOMM Dilution, if any) of the Aggregate Membership Interest.

11. **"Base Loral GSH Proceeds"** means (as of a date of determination) the product of (a) the quotient of (i) $879,586,784 divided by (ii) the sum of (x) Maximum Allowable Amount of General Unsecured Claims and (y) $879,586,784 and (b) the proceeds of the sale of the GSH Interest to be distributed to holders of Allowed General Unsecured Claims, if any, pursuant to III.B.4(c) and III.B.5.

12. **"Base Loral Membership Interest"** means (as of a date of determination) a Membership Interest equal to the product of (a) the quotient of (i) $879,586,784 divided by (ii) the sum of (x) the Maximum Allowable Amount of General Unsecured Claims and (y) $879,586,784 and (b) the Base Creditor Membership Interest.

13. **"Business Day"** means any day, other than a Saturday, Sunday or legal holiday (as defined in Bankruptcy Rule 9006(a)).

14. **"Cash"** means legal tender of the United States of America.

15. **"Cause of Action"** means any action, cause of action, suit, account, controversy, agreement, promise, right to legal remedy, right to an equitable remedy (including any equitable subordination and recharacterization of claims actions), right to payment or claim, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable directly, indirectly or derivatively, in law, equity or otherwise, including a Recovery Action.

16. **"Chapter 11 Case"** means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor in the Bankruptcy Court, and (b) when used with reference to all Debtors, the chapter 11 cases pending for the Debtors in the Bankruptcy Court.

- 2 -

17. **"Claim"** means a claim, as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

18. **"Class"** means a class of Claims or Interests, as described in Article II.

19. **"Commitment Fee"** means the commitment fee payable pursuant to Section 7.3 of the Creditor DIP Facility.

20. **"Commitment Fee Claim"** means the Administrative Claim relating to the Commitment Fee.

21. **"Confirmation"** means the entry of the Confirmation Order on the docket of the Bankruptcy Court.

22. **"Confirmation Date"** means the date on which the Bankruptcy Court enters the Confirmation Order on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

23. **"Confirmation Hearing"** means the hearing held by the Bankruptcy Court on Confirmation of the Plan, as such hearing may be continued from time to time.

24. **"Confirmation Order"** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

25. **"Convenience Claim"** means a Claim, other than a Senior Note Claim, that would otherwise be a General Unsecured Claim, but with respect to each such Claim, the applicable Claim either (a) is equal to or less than $5,000 or (b) is reduced to $5,000 pursuant to a timely election by the Claim holder made on the Ballot.

26. **"Creditors Committee"** means the official committee of unsecured creditors of the Debtors appointed by the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

27. **"Creditor DIP Lender"** means each of ICO Investment Corp., Blue River Capital LLC, Iridium Investors, LLC, Loeb Partners Corp. and Columbia Ventures Corporation, in their respective capacities as lender pursuant to the Creditor DIP Facility.

28. **"Creditor DIP Facility"** means the $10,000,000 Secured Super-Priority Debtor in Possession Credit Agreement, dated as of February 24, 2003, among GLP as borrower, the other Debtors as guarantors, and the Creditor DIP Lenders, which is attached to GLP's Current Report on Form 8-K filed with the Securities and Exchange Commission on February 27, 2003.

29. **"Debtors"** means, collectively, GLP, GCC, Globalstar Services Company, Inc., a Delaware corporation, and Globalstar (Debtor), LLC (f/k/a Globalstar, L.L.C.), a Delaware limited liability company.

30. **"Debtors in Possession"** means the Debtors in their capacity as debtors in possession in the chapter 11 cases pursuant to sections 1101, 1107(c) and 1108 of the Bankruptcy Code.

31. **"Depository"** means The Depository Trust Company, or its nominee, CEDE & Co.

32. **"Disbursing Agent"** means GCC (and subsequent to its dissolution, New Globalstar), and any of its designees, including Wells Fargo Bank, each in its capacity as disbursing agent, or their successors.

33. **"Disclosure Statement"** means the disclosure statement (including all exhibits and schedules thereto or referenced therein) that relates to the Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as the same may be amended, modified or supplemented.

34. **"Disputed"** means, with reference to any Claim, (a) any Claim to the extent that the allowance of such Claim is (or which GCC (or following its dissolution, New Globalstar) determines may be) the

- 3 -

subject of an objection, appeal or a motion to estimate interposed by a party in interest, which objection, appeal or motion has not been determined by a Final Order, (b) any Claim to the extent that the Claim is scheduled as disputed, contingent or unliquidated or (c) with respect to a Claim scheduled as other than disputed, contingent or unliquidated, that portion of such Claim in excess of the amount of such Claim scheduled by Debtors; provided that any Disputed Claim (other than a Securities Litigation Claim) shall cease to be a Disputed Claim if no objection to such Claim is filed and served on or prior to the date that is 60 days after the later of the Effective Date and the date proof of such Claim or Interest or request for payment of Administrative Claims is filed by the holder thereof, or such later date as may be established by an order of the Bankruptcy Court.

        35. **"Disputed Claims Factor"** means a number equal to ratio that the amount reserved (expressed as an amount of Claims) on account of Disputed General Unsecured Claims in accordance with Section VIII.C bears to the sum of (i) such amount, (ii) $879,586,784, and (iii) Allowed General Unsecured Claims as of the Rights Expiration Time.

        36. **"Disputed Claims Reserve"** means (a) Cash to be held in reserve for distribution to holders of Allowed Priority Claims, Allowed Priority Tax Claims, Allowed Secured Claims, and Allowed Convenience Claims, (b) Cash and the Membership Interests to be held in reserve for distribution to holders of Allowed General Unsecured Claims and Allowed Loral Claims as provided in Section VII.C, and (c) Cash and Membership Interests with respect to the exercise of the Series A Rights and Series B Rights.

        37. **"Distribution Record Date"** means the day that is the second Business Day after the Confirmation Date.

        38. **"DTC Participant"** means the bank, broker, or other nominee that is the record holder of the securities position on record at the Depository with respect to the Senior Notes and which holds such with securities position for the account of the beneficial owner of the Senior Notes, including, without limitation, the DTC Participant itself in its capacity as beneficial owner to the extent that the DTC Participant holds Senior Notes for its own account.

        39. **"Effective Date"** means the first Business Day on which all conditions to the Effective Date in Section X.B have been met or waived pursuant to Section X.C.

        40. **"Entity"** means such term as defined in section 101(15) of the Bankruptcy Code.

        41. **"ERISA"** means the Employment Retirement Income Security Act of 1974.

        42. **"Escrow Agent"** means the escrow agent holding the Cash with respect to the cash Commitment Fee under the Creditor DIP Facility.

        43. **"Estate"** means, as to each Debtor, the estate created for that Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

        44. **"Executory Contract and Unexpired Lease"** or **"Executory Contract or Unexpired Lease"** means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection pursuant to section 365 of the Bankruptcy Code, which, in the case of Executory Contracts and Unexpired Leases of real property, include Executory Contracts and Unexpired Leases granting rights or interests related to or appurtenant to the applicable real property, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easements, operating agreements, vault, tunnel, or bridge agreements or franchises, development rights and any other interests in real estate or rights in rem related to the applicable real property.

        45. **"Final Order"** means (a) an order of the Bankruptcy Court as to which the time to appeal, petition for certiorari or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, reargument or rehearing thereof has been filed or sought, or order of the Bankruptcy Court that shall have

- 4 -

been affirmed by the highest court to which such order was appealed, or as to which certiorari shall have been denied or reargument or rehearing shall have been denied or which resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Rules, may be filed with respect to such order shall not cause such order not to be a Final Order.

46. **"GCC"** means Globalstar Capital Corporation, a Delaware corporation, one of the Debtors and a wholly-owned subsidiary of GLP.

47. **"General Partners Committee"** means the governing body of GLP.

48. **"General Partners Committee Releasees"** means the following six individuals: Sir Ronald Grierson, Olof Lundberg, Russell R. Mack, Bernard L. Schwartz, A. Robert Towbin and Eric J. Zahler.

49. **"General Unsecured Claim"** means any Claim that is not an Administrative Claim, Priority Claim, Priority Tax Claim, Secured Claim, Convenience Claim, Insured Claim, Loral Claim, Noteholder Securities Litigation Claim or Shareholder Securities Litigation Claim.

50. **"Globalstar Pensioners"** means the current and former employees of the Debtors who are participants under the Loral Pension Plan, and the beneficiaries of such participants.

50A. **"Globalstar Pension Plan"** means the pension plan and trust which was formed to accept the assets and liabilities of the Globalstar Pensioners in accordance with the terms and conditions of the Retirement Plan Assumption Agreement among Globalstar, New Globalstar, GSH, and the Committee for the Retirement Plan of Space Systems/Loral, Inc., dated as of April 14, 2004.

51. **"GLP"** means Globalstar, L.P., a Delaware limited partnership and one of the Debtors.

52. **"GLP Partnership Interests"** means the ordinary partnership interests and both classes of redeemable preferred partnership interests in GLP (including all ordinary partnership interests which are reserved to provide for purchases of interests by GTL upon exercise of options to purchase GTL common stock) and all rights associated therewith (including any right to a distribution or dividend with respect to such ordinary and preferred partnership interests).

53. **"GLP Subsidiary Debtors"** means, individually or collectively, a Debtor or Debtors other than GLP.

54. **"GP Debtors"** means, collectively, LGP (Bermuda) Ltd, a Bermuda company, Loral/QUALCOMM Satellite Services, L.P., a Delaware limited partnership, Loral/QUALCOMM Partnership, L.P., a Delaware limited partnership, and Loral General Partner, Inc., a Delaware corporation.

55. **"GSH"** means Globalstar Holdings LLC, a Delaware limited liability company.

56. **"GSH Interest"** means the 1% membership interest in GSH owned by the Debtors from and after the Interest Acquisition Date that will be transferred to the Disbursing Agent on the Effective Date for disposition in accordance with Section IV.A.2.

57. **"GTL"** means Globalstar Telecommunications Limited, a Bermuda exempted company and a general partner of GLP.

58. **"Indenture Trustee"** means The Bank of New York, as indenture trustee under the Senior Note Indentures, or any successor thereto.

- 5 -

59. **"Insured Claims"** means Claims that otherwise would be General Unsecured Claims, Loral Claims, Noteholder Securities Litigation Claims, or Shareholder Securities Litigation Claims to the extent that such Claims are insured by insurance policy coverage against the loss or damage giving rise to such Claims and are payable under such insurance policy.

60. **"Interest"** means any capital stock, partnership interest, limited liability company membership interest or other ownership interest in a Debtor, including GLP Partnership Interests.

61. **"Interest Acquisition Date"** means April 14, 2004.

62. **"Loral"** means Loral Space & Communications Ltd., a Bermuda company.

63. **"Loral Claims"** means all Claims of the Loral Entities other than (a) Administrative Claims arising (i) for cure amounts, if any, due in connection with the assumption and assignment of contracts or leases or (ii) in an ordinary course of business commercial transaction between a Globalstar Entity or its Representatives on the one hand and a Loral Entity, GP Debtor, or one of their Representatives, on the other hand, (b) Claims arising under the Loral Settlement Agreement, (c) Claims for indemnification covered by insurance policies solely to the extent of such insurance coverage, and (d) Loral Vendor Financing Claims.

64. **"Loral Entities"** means, collectively: (a) Loral; (b) Loral Space & Communications Corporation; (c) SS/L; (d) Loral/DASA Globalstar, L.P.; (e) Loral SpaceCom Corporation; (f) Loral Satellite, Inc.; (g) Loral CyberStar International, Inc.; and (h) all of the respective current direct and indirect subsidiaries and affiliates of the entities identified in subclauses (a) through (g) of this Section I.A.64 (other than the Debtors, their Non-Debtor Subsidiaries, GlobalTel C.J.S.C., ATTS/Loral Mexico, L.P., Mexico Satellite LLC, Globalstar de Mexico S. de R.L. de C.V., Servicios Corporativos Alcance S.A. de C.V., Loral/DASA Brasil Holdings Ltda., and Globalstar do Brasil, S.A. and the GP Debtors).

65. **"Loral GSHI Proceeds"** means the proceeds of the sale of the GSHI Interest equal to the difference between the Base Loral GSHI Proceeds and the Total Release-Based GSHI Proceeds.

66. **"Loral Membership Interest"** means a Membership Interest equal to the difference between the Base Loral Membership Interest and the Total Release-Based Membership Interest.

67. **"Loral Pension Plan"** means defined benefit plan, known as the Retirement Plan of Space Systems/Loral, Inc.

68. **"Loral Release"** means the release to be granted pursuant to Section XII.B hereof to implement and effectuate the Loral Settlement Agreement.

69. **"Loral Settlement Agreement"** means the Settlement Agreement and Release, dated April 8, 2003, by and among the Creditors Committee, GLP, Loral and certain of their respective affiliates.

70. **"Loral Vendor Financing Claims"** means vendor financing Claims related to third party subcontractors to SS/L, as listed on Schedule 7.1 of the Loral Settlement Agreement, including those arising under that certain agreement, dated as of February 16, 1994, between SS/L and GLP, as such agreement may have been subsequently modified, amended or supplemented.

71. **"Maximum Allowable Amount"** means, with respect to any Allowed Claim, the amount of such Allowed Claim, and with respect to any Disputed Claim (or any other Claim that is not an Allowed Claim), (a) in the case that a proof of Claim is filed by the holder in a liquidated amount, the amount set forth in the proof of Claim, and (b) in the case that a proof of Claim is filed by the holder in an unliquidated, undetermined or contingent amount, the amount determined by a good faith estimate by the Debtors, provided, however, if there is an order of the Bankruptcy Court or any other court of competent jurisdiction estimating the amount for such Claim for allowance, distribution and reserve purposes, the Maximum Allowable Amount for such Claim shall be amount determined by such order.

- 6 -

72. **"Membership Interest"** means a membership interest in New Globalstar.

73. **"New Globalstar"** means New Operating Globalstar LLC, a Delaware limited liability company, which was formed on November 21, 2003.

74. **"New Globalstar LLC Agreement"** means the Amended and Restated Limited Liability Company Agreement of New Globalstar, substantially in the form annexed to the Disclosure Statement as Exhibit D.

75. **"Non-Debtor Subsidiaries"** mean all of the Debtors' non-debtor subsidiaries which the Debtors own more than 50% of the equity interest as of the Effective Date, including Globalstar Corporation, and Globalstar Satellite Services, Inc.

76. **"Noteholder Securities Litigation Claims"** means any Claim against any of the Debtors, whether or not subject to an existing lawsuit, arising from rescission of a purchase or sale of a debt security (including any warrant or right to purchase, sell or subscribe for any debt security in a Debtor or any affiliates thereof) of the Debtor or an affiliate of the Debtor, for damages arising from such purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim, whether or not transferable, including, without limitation, those Claims asserted by purchasers of Senior Notes in the Securities Class Action.

77. **"Person"** shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

78. **"Petition Date"** means February 15, 2002.

79. **"Plan"** means this Joint Plan of Liquidation under Chapter 11 of the Bankruptcy Code, to the extent applicable to any Debtor, as the same may be amended, modified or supplemented.

80. **"Priority Claim"** a Claim that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code that is not an Administrative Claim or a Priority Tax Claim.

81. **"Priority Tax Claim"** means a Claim that is entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code. A Priority Tax Claim shall not include any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim. Any such penalty shall be treated as a General Unsecured Claim.

82. **"Professional"** means any professional employed in the Chapter 11 Cases pursuant to sections 327, 328 or 1103 of the Bankruptcy Code or any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

83. **"Pro Rata"** means (as of a date of determination) when used with reference to:

    a.    the distribution of the Base Creditor Membership Interest or the proceeds of the sale of the GSH Interest (but excluding distributions on account of Total Release-Based Consideration), the ratio (expressed as a percentage) that the amount of such Allowed General Unsecured Claim bears to the sum of (i) the Maximum Allowable Amount of all General Unsecured Claims (as of a date of determination), and (ii) $879,586,784;

    b.    the distribution of the Standard Release-Based Consideration and Supplemental Release-Based Consideration, if applicable, to a holder of an Allowed General Unsecured Claim, the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the sum of the Maximum Allowable Amount of all General Unsecured Claims (as of a date of determination) of holders that are

- 7 -

entitled to receive Standard Release-Based Consideration and Supplemental Release-Based Consideration, if applicable, in accordance with Section VI.D.1(c) hereof;

c.     a Series A Primary Exercise or a Series B Primary Exercise (a) by the Loral Entities (in the aggregate), the product of (i) the ratio (expressed as a percentage) that $459,586,784 bears to the amount of the Claims of all Undisputed Holders as of the Rights Expiration Time, multiplied by (ii) 1.00 minus the Disputed Claims Factor, and (b) a holder of an Allowed General Unsecured Claim, the product of (i) the ratio (expressed as a percentage) that the product of (x) the amount of any Allowed General Unsecured Claim as of the Rights Expiration Time multiplied by (y) the sum of all Allowed General Unsecured Claims as of the Rights Expiration Time plus $420,000,000 bears to the amount of the Claims of all Undisputed Holders as of the Rights Expiration Time, multiplied by (ii) 1.00 minus the Disputed Claims Factor; provided, that such calculation shall be subject to procedures set forth in Section VIII.C.1 with respect to the Disputed Claim Factor provided further, that the Claims of all Undisputed Holders shall include Loral Claims in the aggregate amount of $479,586,784.

84. **"QUALCOMM"** means QUALCOMM Incorporated, a Delaware corporation.

85. **"QUALCOMM Dilution"** means, when used with respect to the percentage of any Membership Interests, dilution resulting from the issuance of a Membership Interest to QUALCOMM in connection with a potential equity-for-equipment transaction; provided, however, that Membership Interests issued to QUALCOMM or its affiliates in connection with such transaction that may dilute the Base Creditor Membership Interests, Series A Rights or Series B Rights shall not exceed 4% of the Membership Interests in New Globalstar, and any Membership Interests issued to QUALCOMM in such a transaction in excess of such percentage shall dilute only the Membership Interests held by Thermo Satellite L.P., provided further, that if fewer than 28,500 phones are delivered to New Globalstar in connection with such a transaction, then the applicable percentage set forth in the immediately preceding proviso shall be reduced to 4% multiplied by the ratio that the number of phones delivered to New Globalstar bears to 28,500.

86. **"QUALCOMM Entities"** means QUALCOMM, QUALCOMM Wireless Services (Mexico) S.A. de C.V., QUALCOMM International Wireless Technology, Inc., QUALCOMM China Inc., QUALCOMM Global Services, Inc., QUALCOMM International, Inc., QUALCOMM Europe S.A.R.L., QUALCOMM Korea Limited, QUALCOMM International, Inc., and QUALCOMM Global Services Inc.

87. **"QUALCOMM Settlement Agreement"** means the Settlement Agreement and Release, among the Debtors, the Non-Debtor Subsidiaries, the Creditors Committee, Thermo, New Globalstar, and QUALCOMM, substantially in the form filed with the Court on March 1, 2004.

88. **"Quarterly Distribution Date"** means the last Business Day of each of April, July, October and January commencing on July 31, 2004.

89. **"Recovery Actions"** means, collectively and individually: (a) preference actions, fraudulent conveyance actions, rights of setoff and other claims or causes of action under sections 510, 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code and other applicable bankruptcy or non-bankruptcy law; (b) claims or causes of action arising out of illegal dividends or similar theories of liability; (c) claims or causes of action based on piercing the corporate veil, alter ego liability, or similar legal or equitable theories of recovery arising out of the ownership or operation of the Debtors; (d) claims or causes of action based on unjust enrichment; (e) claims or causes of action for breach of fiduciary duty, mismanagement, malfeasance or fraud against any of the Debtors; (f) claims or causes of action relating to the provision of retiree medical benefits and the provision of director and officer liability insurance or indemnification; and (g) claims or causes of action arising out of any contracts or other agreements between or among any of the Debtors.

- 8 -

90. **"Representative(s)"** means, with respect to (i) any entity (including the Creditors Committee) other than a Debtor, any and all of its current or former officers, directors, members of its general partners' committee, direct or indirect general partners, direct or indirect limited partners, attorneys, advisors, and investment bankers, in each case, solely in their capacity as such, (ii) a Debtor, any and all of its officers, directors, members of its general partners' committee (including, as to GLP, the General Partners Committee), direct or indirect general partners, direct or indirect limited partners, attorneys, advisors and investment bankers, in each case, that were Representatives on or after the Petition Date (provided, that Representatives of a Debtor who are also Representatives of the Loral Entities or QUALCOMM Entities shall be Representatives of a Debtor regardless of whether they were Representatives of a Debtor on or after the Petition Date), in each case, solely in their capacity as such, and (iii) the Creditors Committee, any current or former member thereof (solely in its capacity as such).

91. **"Rights Expiration Time"** means 4:00 p.m., New York City time, on October 12, 2004, or, if such day is not a Business Day, the following Business Day.

92. **"Schedules"** means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors, as required by section 521 of the Bankruptcy Code and the Official Bankruptcy Forms, as the same may have been or may be amended, modified or supplemented.

93. **"Secondary Liability Claim"** means a Claim that arises from a Debtor being liable as a guarantor of, or otherwise being jointly, severally or secondarily liable for, any contractual, tort or other obligation of another Debtor, including any Claim based on: (a) guaranties of collection, payment or performance; (b) indemnity bonds, obligations to indemnify or obligations to hold harmless; (c) performance bonds; (d) contingent liabilities arising out of contractual obligations or out of undertakings (including any assignment or other transfer) with respect to leases, operating agreements or other similar obligations made or given by a Debtor relating to the obligations or performance of another Debtor; (e) vicarious liability; (f) liabilities arising out of piercing the corporate veil, alter ego liability or similar legal theories; or (g) any other joint or several liability that any Debtor may have in respect of any obligation that is the basis of a Claim.

94. **"Secured Claim"** means a Claim that is secured by a lien on property in which an Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to sections 506(a) and, if applicable, 1129(b) of the Bankruptcy Code.

95. **"Securities Act"** means the Securities Act of 1933, as amended.

96. **"Securities Class Action"** means the consolidated class action, In re Globalstar Securities Litigation, 01 Civ. 1748 (PKC) pending in the United States District Court for the Southern District of New York, for which the class has not yet been certified.

97. **"Securities Litigation Claims"** means, collectively, Noteholder Securities Litigation Claims and Shareholder Securities Litigation Claims, including Claims asserted in the Securities Class Action.

98. **"Securities Litigation Defendants"** means, collectively, Globalstar, GCC, GTL, Loral, and Mr. Bernard Schwartz.

99. **"Senior Note Claim"** means a prepetition Claim for principal, interest and other charges arising under the Senior Note Indentures. A Noteholder Securities Litigation Claim is not a Senior Note Claim.

100. **"Senior Note Indentures"** means, collectively, (a) the Indenture, dated as of February 15, 1997, relating to GLP and GCC's 11.375% Senior Notes due 2004; (b) the Indenture, dated as of June 1, 1997, relating to GLP and GCC's 11.25% Senior Notes due 2004; (c) the Indenture, dated as of October 15, 1997, relating to GLP and GCC's 10.75% Senior Notes due 2004; and (d) the Indenture, dated as of May 20, 1998, relating to GLP and GCC's 11.5% Senior Notes due 2005.

- 9 -

101. **"Senior Notes"** means, collectively, the 11.375% Senior Notes due February 15, 2004, the 11.25% Senior Notes due June 15, 2004, the 10.75% senior notes due November 1, 2004, and the 11.5% Senior Notes due June 1, 2005, issued by GLP and GCC as co-obligors.

102. **"Series A Exercise Notice"** means a form of exercise notice to be delivered to each holder of a Series A Right as provided in Article VIII and the instructions thereto.

103. **"Series A Oversubscription Exercise"** means, with respect to an Undisputed Holder of a Series A Right that has sought to acquire all of its Pro Rata share of the Series A Rights Consideration pursuant to a Series A Primary Exercise, the exercise by such holder to acquire all or any portion of the Series A Rights Consideration remaining after the Series A Primary Exercise.

104. **"Series A Primary Exercise"** means the exercise by an Undisputed Holder of a Series A Right to acquire all or a portion of its Pro Rata share of the Series A Rights Consideration.

105. **"Series A Rights"** means uncertificated, nontransferable rights exercisable in the aggregate to purchase the Series A Rights Consideration as provided in Article VIII.

106. **"Series A Rights Aggregate Exercise Price"** means $8,000,000.

107. **"Series A Rights Consideration"** means 15.12% of the Aggregate Membership Interests, subject to reduction as a result of QUALCOMM Dilution, if any.

108. **"Series A Rights Exercise Price"** means an amount in cash equal to the product of (i) the quotient obtained by dividing the Series A Aggregate Exercise Price by the percentage of the Aggregate Membership Interests comprising the Series A Rights Consideration and (ii) 0.000001.

109. **"Series B Exercise Notice"** means a form of exercise notice to be delivered to each holder of a Series B Right as provided in Article VIII and the instructions thereto.

110. **"Series B Oversubscription Exercise"** means, with respect to an Undisputed Holder of a Series B Right that has sought to acquire all of its Pro Rata share of the Series B Rights Consideration pursuant to a Series B Primary Exercise, the exercise by such holder to acquire all or any portion of the Series B Rights Consideration remaining after the Series B Primary Exercise.

111. **"Series B Primary Exercise"** means the exercise by an Undisputed Holder of a Series B Right to acquire all or a portion of its Pro Rata share of the Series B Rights Consideration.

112. **"Series B Rights"** means uncertificated, nontransferable rights exercisable in the aggregate to purchase the Series B Rights Consideration as provided in Article VIII.

113. **"Series B Rights Aggregate Exercise Price"** means $4,000,000.

114. **"Series B Rights Consideration"** means 2.5% of the Aggregate Membership Interests, subject to reduction as a result of QUALCOMM Dilution, if any.

115. **"Series B Rights Exercise Price"** means an amount in cash equal to the product of (i) the quotient obtained by dividing the Series B Aggregate Exercise Price by the percentage of the Aggregate Membership Interests comprising the Series B Rights Consideration and (ii) 0.000001.

116. **"Shareholder Securities Litigation Claims"** means any Claim against any of the Debtors, whether or not subject to an existing lawsuit, arising from rescission of a purchase or sale of a security other than a debt security (including any warrant or right to purchase, sell or subscribe for any security other than a debt security in a Debtor or any affiliate thereof) of the Debtor or an affiliate of the Debtor, for damages arising from such purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the

- 10 -

Bankruptcy Code on account of such Claim, whether or not transferable. Shareholder Securities Litigation Claims include any such Claims by GTL shareholders against any of the Debtors, including those Claims asserted by GTL shareholders in the Securities Class Action.

117. **"SLC Settlement Event"** means the settlement, by the Loral Entities, of the Securities Litigation Claims pursuant to a settlement agreement approved by the court having jurisdiction over the Securities Class Action, and a certified copy of such approval has been received by the Disbursing Agent.

118. **"SS/L"** means Space Systems/Loral, Inc., a Delaware corporation.

119. **"Standard Release-Based Consideration"** means, collectively, the Standard Release-Based GSHI Proceeds and the Standard Release-Based Membership Interest.

120. **"Standard Release-Based GSHI Proceeds"** means the proceeds equal to the product of (a) the quotient of (i) $315 million divided by (ii) the sum of all Allowed General Unsecured Claims and $879,586,784, multiplied by (b) the proceeds of the sale of the GSH Interest, if any, to be distributed to holders of Allowed General Unsecured Claims.

121. **"Standard Release-Based Membership Interest"** means a Membership Interest equal to the product of (a) the quotient of (i) $315 million divided by (ii) the sum of all Allowed General Unsecured Claims and $879,586,784, multiplied by (b) the Base Creditor Membership Interest.

122. **"Supplemental Release-Based Consideration"** means, collectively, the Supplemental Release-Based GSHI Proceeds and the Supplemental Release-Based Membership Interest.

123. **"Supplemental Release-Based GSHI Proceeds"** means the proceeds equal to the product of (a) the quotient of (i) $105 million divided by (ii) the sum of all Allowed General Unsecured Claims and $879,586,784, multiplied by (b) the proceeds of the sale of the GSH Interest, if any, to be distributed to holders of Allowed General Unsecured Claims.

124. **"Supplemental Release-Based Membership Interest"** means a Membership Interest equal to the product of (a) the quotient of (i) $105 million divided by (ii) the sum of all Allowed General Unsecured Claims and $879,586,784, multiplied by (b) the Base Creditor Membership Interest.

125. **"Tax"** means (a) any net income, alternative or add-on minimum, gross income, gross receipts, sales, use, ad valorem, value added, employment, transfer, franchise, profits, license, property, environmental or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other entity.

126. **"Thermo"** means Thermo Capital Partners, L.L.C.

127. **"Third Party Releases"** means a release providing that each (a) Non-Debtor Subsidiary, (b) holder of (i) a Claim (whether or not allowed) against or Interest in a Debtor or (ii) a GLP Partnership Interest, and (c) Person participating in exchanges and distributions under or pursuant to the Plan shall be enjoined from commencing and continuing any Cause of Action, employment of process or act to collect, offset or recover and shall release any Claim, Cause of Action arising from the beginning of time through the Confirmation Date against the Loral Entities or any Representative thereof in any way directly or indirectly relating to or concerning the Debtors, including without limitation their management and operations, the Chapter 11 Cases or the Plan (other than (i) claims arising after the Confirmation Date under any Assumed Contract; (ii) claims for all sums due in connection with ordinary course postpetition commercial transactions between any Loral Entity and any Globalstar Entity; and/or (iii) claims arising under the Loral Settlement Agreement).

- 11 -

128. **"Total Release-Based Consideration"** means, collectively, the Total Release-Based Membership Interest and the Total Release-Based GSHI Proceeds.

129. **"Total Release-Based GSHI Proceeds"** means the Standard Release-Based GSHI Proceeds and the Supplemental Release-Based GSHI Proceeds.

130. **"Total Release-Based Membership Interest"** means the Standard Release-Based Membership Interest and the Supplemental Release-Based Membership Interest.

131. **"Undisputed Holder"** means a holder of a (a) General Unsecured Claim, but only to the extent such Claim is an Allowed Claim as of the Rights Expiration Time, or (b) Loral Claim.

## B.    Rules of Interpretation and Computation of Time

### 1.    Rules of Interpretation

For purposes of the Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in the Plan, any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document means such document as it may have been or may be amended, modified or supplemented pursuant to the Plan, Confirmation Order or otherwise; (d) any reference to an entity as a holder of a Claim or Interest includes that entity's successors, assigns and affiliates; (e) all references in the Plan to Sections and Articles are references to Sections and Articles of or to the Plan; (f) the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (h) subject to the provisions of any contract, certificates of incorporation, bylaws, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan, and except to the extent the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, the rights and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, the laws of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction; (i) "including" means "including without limitation" and (j) the rules of construction set forth in section 102 of the Bankruptcy Code will apply.

### 2.    Computation of Time

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) will apply.

## ARTICLE II.  CLASSES OF CLAIMS AND INTERESTS

All Claims and Interests, except Administrative Claims and Priority Tax Claims, are placed in the following Classes. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, as described in Sections III.A.1 and III.A.2, respectively, have not been classified and thus are excluded from the following Classes. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any remainder of the Claim or Interest qualifies within the description of such other Classes. Notwithstanding anything contained herein to the contrary, no Claim or Interests (including Administrative Claims) shall be entitled to or receive postpetition interest.

| Class | Status |
|---|---|
| Class 1 (Priority Claims) | Unimpaired |
| Class 2 (Secured Claims) | Unimpaired |
| Class 3 (Convenience Claims) | Impaired |

- 12 -

| Class 4 (General Unsecured Claims) | Impaired |
| Class 5 (Loral Claims) | Impaired |
| Class 6 (Insured Claims) | Unimpaired |
| Class 7 (Securities Litigation Claims) | Impaired/ Deemed to Reject the Plan |
| Class 8 (Interests) | Impaired/ Deemed to Reject the Plan |

## ARTICLE III. TREATMENT OF CLAIMS AND INTERESTS

### A.    Unclassified Claims

### 1.    Payment of Administrative Claims

#### a.    Administrative Claims in General

Except as specified in this Section III.A.1, unless otherwise agreed to by the holder of an Administrative Claim and the applicable Debtor, each holder of an Allowed Administrative Claim will receive, in full satisfaction of its Administrative Claim, on the later of (i) the Effective Date or (ii) 30 days after such Administrative Claim becomes an Allowed Administrative Claim, or as soon after such dates as is practicable, but in no event more than 5 Business Days thereafter, Cash in an amount equal to such Allowed Administrative Claim.

#### b.    Statutory Fees

On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930 will be paid in Cash equal to the amount of such Administrative Claims. All fees payable pursuant to 28 U.S.C. § 1930 will be paid by the Debtors in accordance therewith until the closing of the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code.

#### c.    Ordinary Course Liabilities

Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business will be paid by the applicable Debtor or New Globalstar pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claims, without any further action by the holders of such Administrative Claims.

#### d.    Professional Compensation and Reimbursement Claims

Entities seeking payment under section 330(a), 331, 503 or 1103 of the Bankruptcy Code for compensation of a Professional or other entity for services rendered or expenses incurred in the Chapter 11 Cases through and including the Effective Date shall (a) file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by no later than the date that is 60 days after the Effective Date or such other date as may be fixed by the Bankruptcy Court, and (b) if granted such an award by the Bankruptcy Court, be paid in full in such amounts as are Allowed by the Bankruptcy Court (i) on the date such Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable, but in no event more than 5 Business Days thereafter, or (ii) upon such other terms as may be mutually agreed upon by such holder of an Administrative Claim and the Debtors.

#### e.    Indenture Trustee's Fees and Expenses

The Indenture Trustee shall have an Allowed Administrative Claim in an amount equal to the reasonable and necessary fees and expenses incurred by the Indenture Trustee and its counsel to the extent provided in the Senior Notes Indentures. On or before 60 days after the Effective Date, the Indenture Trustee shall provide the Debtors, New Globalstar and the Creditors Committee with a reasonably detailed invoice for such fees and expenses incurred through and including the Effective Date. If a dispute arises as to such fees and expenses, then the amount of the Indenture Trustee's Allowed Administrative Claim shall be resolved by the Bankruptcy Court.

- 13 -

f.      **Fees Under the Creditor DIP Facility**

In full satisfaction, release and discharge of all Claims (including Administrative Claims and the Commitment Fee Claim) of the Creditor DIP Lenders under the Creditor DIP Facility: (i) each Creditor DIP Lender, other than ICO Investment Corp., shall receive Membership Interests equal to 0.1222% (subject to a reduction as a result of QUALCOMM Dilution, if any) of the Aggregate Membership Interest, (ii) ICO Investment Corp. shall receive $50,000 from the $250,000 in escrowed funds held by the Escrow Agent in respect of the cash Commitment Fee under the Creditor DIP Facility, (iii) Katten Muchin Zavis Rosenman and Connolly Bove Lodge & Hutz LLP, lead and local counsel for the Creditor DIP Lenders, respectively, shall receive their reasonable unpaid fees and expenses incurred in connection with their representation of the Creditor DIP Lenders. Upon the Effective Date, the Escrow Agent shall hereby be authorized to pay the amounts due in clauses (ii) and (iii) of the preceding sentence (including, with respect to clause (iii), any reasonable estimate for fees and expenses of counsel for the Creditor DIP Lenders to be incurred after the Effective Date in concluding their services or incurred prior the Effective Date but not ready for billing by the Effective Date, which estimate, together with billing statements ready for billing and, when available, billing statements with respect to estimated amounts, shall be provided to counsel for the Debtors by e-mail or otherwise in writing). Upon payment of such amounts, the Escrow Agent shall and hereby is authorized to return the balance of the escrowed funds to New Globalstar and shall thereupon be deemed discharged and released from and to have fully and properly performed its obligations under the escrow agreement. Upon the payment of all actual fees and expenses of lead and local counsel out of the funds paid pursuant to such estimate, counsel for the Creditor DIP Lenders shall return any excess funds to New Globalstar.

2.      **Payment of Priority Tax Claims.**

Unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor, each holder of an Allowed Priority Tax Claim will receive, in full satisfaction of its Priority Tax Claim, on the later of (i) the Effective Date or (ii) 30 days after such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon after such dates as is practicable, Cash in an amount equal to such Allowed Priority Tax Claim

B.      **Classified Claims and Interests**

1.      **Class 1 (Priority Claims) are unimpaired.**

On the Effective Date or as soon thereafter as is practicable, each holder of an Allowed Claim in Class 1 will receive Cash equal to the amount of such Claim in full and complete satisfaction of such Claim. Each holder of a Priority Claim is not entitled to vote and is conclusively presumed to have voted to accept the Plan.

2.      **Class 2 (Secured Claims) are unimpaired.** On the Effective Date or as soon after as is practicable, unless otherwise agreed by a Claim holder and the applicable Debtor, each holder of an Allowed Secured Claim will receive, at the option of the Debtors, in full and complete satisfaction of such Claim (i) Cash in an amount equal to such Allowed Secured Claim, including any interest on such Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, if any, or (ii) be reinstated and rendered unimpaired in accordance with section 1124 of the Bankruptcy Code. Each holder of a Secured Claim is not entitled to vote and is conclusively presumed to have voted to accept the Plan.

3.      **Class 3 Claims (Convenience Claims) are impaired.** On the Effective Date or as soon thereafter as is practicable, each holder of an Allowed Convenience Claim will receive Cash in an amount equal to the product of (a) 0.6 multiplied by (b) the amount of such Allowed Claim, in each case in full and complete satisfaction of such Allowed Convenience Claim. Each holder of a Convenience Claim shall be entitled to vote to accept or reject the Plan.

- 14 -

**4. Class 4 Claims (General Unsecured Claims) are impaired.** Unless otherwise provided in this Plan, each holder of an Allowed General Unsecured Claim shall be entitled to receive, in full satisfaction of such Allowed Claim:

         a.     a Membership Interest representing the sum of (i) the Membership Interest representing its Pro Rata share of the Base Creditor Membership Interest, which Membership Interest shall be allocated on the Effective Date or as soon thereafter as is practicable, and (ii) if such holder is entitled to receive Total Release-Based Membership Interest in accordance with Section VI.D.1(c), the Membership Interest representing its Pro Rata share of the Total Release-Based Membership Interest, which Membership Interest shall be allocated in accordance with Section VI.D.1(c),

         b.     a Series A Right and a Series B Right, which Series A Right and Series B Right are exercisable in accordance with Article VIII of the Plan, and

         c.     if the proceeds of the sale by the Disbursing Agent of the GSHI Interest as contemplated by Section IV.A.2 exceed $100,000, (i) its Pro Rata share of such proceeds, and (ii) if such holder is entitled to receive Total Release-Based GSHI Proceeds, its Pro Rata share of the Total Release-Based GSHI Proceeds, which shall be distributed in accordance with Section VI.D.1(c);

subject to, with respect to the foregoing clauses (a) and (b), the terms and conditions of the New Globalstar LLC Agreement (and such holder shall be deemed to have executed, and shall be bound by, the New Globalstar LLC Agreement) and, with respect to the foregoing clauses (a), (b) and (c), the distribution provisions of the Plan. Each holder of a General Unsecured Claim shall be entitled to vote to accept or reject the Plan.

         d.     **Allowance of Claims in Class 4.**

         (i)     **Allowance of Loral Vendor Financing Claims.** The Loral Vendor Financing Claims are hereby Allowed in the aggregate amount of $52,413,216.

         (ii)     **Allowance of Claims of the QUALCOMM Entities.** The claims of the QUALCOMM Entities are hereby Allowed in the aggregate amount of $661,296,661.30, which shall be allocated in accordance with the QUALCOMM Settlement Agreement.

         (iii)     **Allowance of Senior Notes Claims.** The Senior Notes Claims are hereby Allowed as follows: 11.375% Senior Notes due February 15, 2004, are allowed in the aggregate amount of $590,597,710.94; the 11.25% Senior Notes due June 15, 2004, are allowed in the aggregate amount of $369,522,460.94; the 10.75% senior notes due November 1, 2004 are allowed in the aggregate amount of $372,248,677.92; and the 11.5% Senior Notes due June 1, 2005, are allowed in the aggregate amount of $343,556,250.00.

**5. Class 5 Claims (Loral Claims) are impaired.** Unless otherwise provided in this Plan, each holder of an Allowed Loral Claim will receive, in full satisfaction of such Allowed Loral Claim, and allocated as shall be determined by such holders, (a) subject to Section VI.D.1(c), on the Effective Date or as soon thereafter

- 15 -

as is practicable, its share of the Loral Membership Interests, and, if such holder is entitled to Supplemental Release-Based Membership Interest in accordance with Section VI.D.1(c), its share of such Membership Interest, (b) its share of the Pro Rata share (determined with respect to the Loral Entities in the aggregate) of Series A Rights and Series B Rights, and (c) if the proceeds of the sale by the Disbursing Agent of the GSH Interest as contemplated by Section IV.A.2 exceed $100,000, each holder of an Allowed Loral Claim shall receive its share of the Loral GSHI Proceeds, and if such holder is entitled to Supplemental Release-Based GSHI Proceeds in accordance with Section VI.D.1(c), its share of such proceeds, subject to, with respect to the foregoing clauses (a) and (b), the terms and conditions of the New Globalstar LLC Agreement (and such holder shall be deemed to have executed, and shall be bound by, the New Globalstar LLC Agreement) and, with respect to the foregoing clauses (a), (b) and (c), the distribution provisions of the Plan. Each holder of a Loral Claim shall be entitled to vote to accept or reject the Plan.

        a. **Allowance of Loral Claims**. The Loral Claims are Allowed in the aggregate amount of $879,586,784.

        b. **Reduction in Loral Claims**. If the Confirmation Order binds some of the holders of Claims against the Debtors to the Third Party Release, the distribution otherwise allocable to the Loral Entities on account of (i) $315 million of the Allowed Loral Claim shall be distributed to the holders of Allowed General Unsecured Claims who are entitled to receive Standard Release-Based Consideration in accordance with Section VI.D.1(c), and (ii) $105 million of the Allowed Loral Claim shall be distributed to the holders of Allowed General Unsecured Claims or to holders of Allowed Loral Claims, as the case may be, who are entitled to receive Supplemental Release Based Consideration.

        c. **Assignment of GlobalTel C.J.S.C. Interest**. Loral or its designee shall receive title to the equity interests in GlobalTel C.J.S.C. held by the Debtors or the Non-Debtor Subsidiaries in accordance with Section IV.A.5.

    **6.** **Class 6 Claims (Insured Claims) are unimpaired.** Each holder of an Allowed Insured Claim is only entitled to payment from proceeds payable to the holder thereof under any pertinent insurance policies. Each holder of an Insured Claim is not entitled to vote and is conclusively presumed to have voted to accept the Plan. The Debtors shall have no obligation to incur fees (including attorneys' fees), costs or expenses or to defend against any Claim that may have recourse against an insurance policy or to prosecute an objection to any Insured Claim.

    **7.** **Class 7 Claims (Securities Litigation Claims) are impaired.** The holders of Securities Litigation Claims shall receive no distributions under the Plan. Each holder of a Securities Litigation Claim shall be deemed to reject the Plan.

    **8.** **Class 8 Interests (Interests) are impaired.** The holders of the Interests shall receive no distributions under the Plan. Each holder of a GLP Partnership Interest in Class 8 shall be deemed to reject the Plan.

## ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN

### A. Implementation of the Plan

### 1. Dissolution of the Debtors

        a. Immediately following the Effective Date, each Debtor other than GCC, and at such later date as GCC dissolves, GCC, shall be deemed dissolved for all

- 16 -

purposes without the necessity for any other or further actions to be taken or payments to be made in connection therewith, and each such Debtor shall promptly thereafter file with the Office of the Secretary of State of the State of Delaware a certificate of dissolution, which may be executed by an officer of such Debtor without the need for approval by the General Partners Committee, its Board of Directors or its managers, as the case may be, or by its equity holders. From and after the Effective Date, no Debtor shall be required to file any document, or take any other action, or obtain any approval from the General Partners Committee, its Board of Directors, or its managers, as the case may be, or from its equity holders, to withdraw its business operation from any states in which such Debtor previously conducted its business operations or take any other steps to accomplish such purposes.

b.  From and after the Effective Date, GCC shall continue in existence for the purpose of (i) winding-down its affairs, (ii) administering the Plan and taking such actions as are necessary to consummate the Plan, and (iii) filing appropriate tax returns. From and after the Effective Date, the then current directors of GCC (Anthony J. Navarra, Daniel P. McEntee, and William F. Adler) shall continue to serve in such capacities and William F. Adler shall serve as president, treasurer, and secretary (and all bylaws, articles or certificates of incorporation, and related corporate documents are deemed amended by the Plan to permit their continued service) of GCC through the earlier of the date GCC is dissolved in accordance with Section IV.A.1(a) and the date such director or officer resigns, is terminated or otherwise unable to serve; provided, however, that, in the event that any director or officer of GCC resigns, is terminated or unable to serve as a director or officer, then the remaining directors (subject to the consent of the Minority Director(s) as defined in the New Globalstar LLC Agreement) shall have the right to select a successor who shall be appointed a director or officer of GCC, and shall serve in such capacity until GCC is dissolved in accordance with Section IV.A.1(a) or until such director resigns, or is replaced or is terminated. After the Effective Date, any officer or director of GCC may be terminated "for cause" (including fraud, negligence or misconduct) by GCC. From and after the Effective Date, the director and officers of GCC shall be authorized to operate GCC for the purposes set forth in this Section IV.A.1(c) without the need for any further notice to or approval by the stockholder of GCC. GCC, in its discretion, may dissolve prior to the resolution of all Disputed Claims and the closing of the Chapter 11 Case.

c.  Immediately prior to the dissolution of each Debtor, any property of such Debtor not previously transferred, or to be transferred in connection with the Plan to another Entity shall be, at the option of the Debtors, transferred to New Globalstar or deemed abandoned; provided that (i) Cash in an amount necessary to make distributions under the Plan (including reserves for Administrative Claims and Disputed Claims) shall be transferred to the Disbursing Agent and the Disputed Claims Reserve, as provided for by the Plan; and (ii) the Interests of the Debtors (other than GCC) in the Non-Debtor Subsidiaries or any other Entity not previously transferred to New Globalstar or to be transferred in connection with the Plan shall be transferred to GCC. Any Claims or Causes of Action not transferred to New Globalstar pursuant to the Asset Contribution Agreement shall be transferred to the Disbursing Agent for purposes of effectuating a setoff as contemplated by Section VI.H and the recoveries from or proceeds of any such Claim or Cause of Action (after giving effect to such setoff) shall be transferred to New Globalstar.

- 17 -

## 2. Disposition of the GSH Interest

On the Effective Date, the Debtors will transfer the GSH Interest to the Disbursing Agent. The Disbursing Agent will hold the GSH Interest for the benefit of the holders of Allowed General Unsecured Claims and the Allowed Loral Claims, and will use commercially reasonably efforts to sell the GSH Interest. If the proceeds from the sale of the GSH Interest exceed $100,000, the Disbursing Agent shall place such proceeds in the Disputed Claims Reserve for distribution in accordance with Section III.B.4(c) and Section III.B.5. If the proceeds from the sale of the GSH interest are equal to, or less than, $100,000, the Disbursing Agent will distribute the sale proceeds to a charity selected by the then-longest serving New Globalstar director selected by the holders of Membership Interests other than Thermo and its affiliates, and if there is no such director, to a charitable organization selected by the chief executive officer of New Globalstar.

## 3. Accounts

The Disbursing Agent may establish one or more interest-bearing accounts as they determine may be necessary or appropriate to effectuate the provisions of the Plan, and may invest all or a portion of the Cash, (i) in tax exempt instruments, (ii) as permitted by section 345 of the Bankruptcy Code, or (iii) otherwise as authorized by the Bankruptcy Court.

## 4. Transfer of Remaining Cash to New Globalstar

After all distributions under the Plan have been made, the Chapter 11 Case has been closed, and all obligations of the Debtors and Disbursing Agent arising after the Confirmation Date have been satisfied in full, the Disbursing Agent shall transfer all remaining Cash to New Globalstar as contemplated by the Asset Contribution Agreement.

## 5. Assignment of GlobalTel C.J.S.C. Interest

On the Effective Date, by virtue of: (a) the Order approving the Loral Settlement Agreement; (b) Loral having the beneficial interest in the 49% of the equity of GlobalTel C.J.S.C. now held by the Debtors; and (c) the dissolution of the applicable Debtors or Non-Debtor Subsidiaries pursuant to the Plan, title to the equity interests in GlobalTel C.J.S.C. held by the Debtors or the Non-Debtor Subsidiaries shall irrevocably pass to Loral or its affiliate designee (which shall be designated by Loral no later than 10 days prior to the Confirmation Hearing) such that Loral or such affiliate designee shall be the Debtors' legal successor with respect to the Debtors or Non-Debtor Subsidiaries' interest in the equity interest in GlobalTel C.J.S.C. The Debtors shall execute and provide to Loral any documents reasonably requested by Loral to evidence such result.

## B. Preservation of Rights of Action; New Globalstar as Estate Representative

Except as otherwise provided in Section XII, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, from and after the Effective Date, and as contemplated by the Asset Contribution Agreement, the Debtors shall transfer to New Globalstar, and New Globalstar will have and may enforce, any and all Causes of Actions that the Debtors may hold against any Entity, including actions for equitable subordination and recharacterization of claims against any Entity, to the extent not released pursuant to Section XII. New Globalstar may pursue such retained Causes of Actions as appropriate, in its discretion. Notwithstanding the foregoing, no Causes of Action may be asserted against any Entity released pursuant to the Plan, the Loral Settlement Agreement, the QUALCOMM Settlement Agreement, and/or in any contract, instrument, release or other agreement approved by the Court or entered into after the Effective Date.

## C. Termination of Certain Employee, Retiree and Workers' Compensation Benefits

## 1. Employee Benefits

a. From and after the Effective Date, all existing employee benefit policies, plans and agreements of the Debtors will be terminated to the extent not transferred to

- 18 -

*To the extent required by ERISA, the Internal Revenue Code, and other applicable laws and regulations* New Globalstar in connection with the consummation of the transactions contemplated by the Asset Contribution Agreement or previously terminated, including, (i) medical, dental, vision, prescription drug, life, travel accident and accidental death and dismemberment insurance; (ii) paid leave (which incorporates sick, personal and bereavement leave), short-term disability pay and long-term disability insurance; (iii) vacation and holiday pay; (iv) bonus and severance programs; (v) tuition assistance policies; (vi) savings plan; (vii) employee assistance program; and (viii) other optional employee paid programs.

b.      Except as otherwise provided in this Section IV.C.1(b), assets in the Loral Pension Plan will remain in such Plan. As of June 1, 2004, New Globalstar is a contributing sponsor and plan administrator of the Globalstar Pension Plan within the meaning of 29 U.S.C. §§ 1301(a)(1) and (a)(13). New Globalstar will fund and maintain the Globalstar Pension Plan ~~in accordance with ERISA, the Internal Revenue Code, and other applicable laws and regulations~~. As of June 1, 2004, the assets and obligations of the Loral Pension Plan with respect to the Globalstar Pensioners have been severed from the Loral Pension Plan and were assumed by New Globalstar and are part of the Globalstar Pension Plan. Employees of the Debtors ceased accruing benefits under the Loral Pension Plan on the earlier of (i) October 25, 2003, the date the plan administrator of the Loral Pension Plan suspended such benefit accruals, as set forth in the notice that such plan administrator previously has given to the Debtors' employees or (ii) the date an employee's employment with the Debtors ceased.

## 2.      Retiree Benefits

Retiree benefit plans for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise), if any, established by the Debtors prior to the Petition Date were discretionary, and, accordingly, no such payments are required to be made pursuant to section 1129(a)(13) of the Bankruptcy Code.

## 3.      Workers' Compensation Benefits

The workers' compensation program of the Debtors maintained by the Debtors, to the extent not assigned to New Globalstar pursuant to the terms and conditions thereof or previously terminated by the Debtors, shall be terminated.

## D.      Cancellation and Surrender of Instruments, Securities and Other Documentation

On the Effective Date and concurrently with the applicable distributions made pursuant to Article IV, the Senior Notes, the Senior Note Indentures, any vendor financing agreements, any credit facility and any other prepetition debt instruments will be canceled and of no further force and effect, without any further action on the part of any Debtor; provided, however, that the Senior Note Indenture shall continue in effect for the purpose of allowing the Indenture Trustee to assert a charging lien against distributions to be made to the holders of the Senior Notes under the Plan for payment of any of its fees and expenses which are not paid under Section III.A.1.e. In the event that distributions to the holders of the Senior Notes are not made by the Indenture Trustee, the charging lien of the Indenture Trustee shall attach (to the extent such attachment does not contravene a provision of the New Globalstar LLC Agreement) to distributions in the possession of the Disbursing Agent to be made to the holders of the Senior Notes with respect to the Allowed Senior Note Claims. The GLP Partnership Interests and Interests in the GLP Subsidiary Debtors shall be deemed canceled and of no further force and effect when the Debtors are dissolved in accordance with Section IV.A.1. The holders of or parties to such canceled instruments, securities and other documentation will have no rights arising from or relating to such instruments, securities and other documentation or the cancellation thereof, except the rights provided pursuant to the Plan; provided, however, that no distribution under the Plan will be made to or on behalf of any holder of an Allowed Claim evidenced by such

- 19 -

canceled instruments or securities unless and until such instruments or securities are received by the applicable Disbursing Agent to the extent required in Section VI.I.

### E.   Release of Liens

Except as otherwise provided in the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article IV, all mortgages, deeds of trust, liens or other security interests against the property of any Estate will be fully released and discharged.

### F.   Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes

The Chief Executive Officer, President, Chief Financial Officer or any Vice President, of each Debtor or the Disbursing Agent will be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan. The Secretary or any Assistant Secretary of each Debtor or the Disbursing Agent will be authorized to certify or attest to any of the foregoing actions. Pursuant to section 1146(c) of the Bankruptcy Code, the following actions taken under, in furtherance of or in connection with the Plan (including the transfer of assets to New Globalstar) shall not be subject to any stamp, real estate, transfer, mortgage recording or other similar tax: (a) the issuance, transfer or exchange of securities; (b) the making or assignment of any lease or sublease; or (c) the making or delivery of any deed, bill of sale, assignment or other instrument of transfer.

## ARTICLE V.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.   Rejection of Executory Contracts and Unexpired Leases Generally

On the Confirmation Date, all Executory Contracts and Unexpired Leases that exist between a Debtor and any person shall be deemed rejected as of the Confirmation Date, except for any Executory Contract or Unexpired Lease (a) that has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Confirmation Date or (b) as to which a motion for approval of the assumption or rejection of such contract or lease has been filed prior to the Confirmation Hearing.

### B.   Approval of Rejection of Executory Contracts and Unexpired Leases

Entry of the Confirmation Order shall constitute the approval, pursuant to section 365(a) of the Bankruptcy Code, of the rejection of the Executory Contracts and Unexpired Leases rejected pursuant to Section V.A.

### C.   Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan

Claims arising out of the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan must be filed with Robert L. Berger & Associates, LLC, PMB 1014, 10351 Santa Monica Blvd., Suite 101A, Los Angeles, CA 90025 no later than 30 days after the Confirmation Date. Any Claims not filed within such applicable time periods will be forever barred from receiving a distribution from the Estates.

## ARTICLE VI.  PROVISIONS GOVERNING DISTRIBUTIONS

### A.   Distributions for Claims or Interests Allowed as of the Effective Date

Except as otherwise provided in this Article VI, distributions of Cash or allocations of the Base Creditor Membership Interest to be made on the Effective Date to holders of Claims that are Allowed as of the

- 20 -

Effective Date will be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than: (1) 30 days after the Effective Date or (2) such later date when the applicable conditions of Section VI.D.2 (regarding undeliverable distributions) or Section VI.I (regarding surrender of canceled instruments and securities) are satisfied.

For any distribution of a Membership Interest to be made pursuant to this Plan (including the distribution of Membership Interests to the Disputed Claims Reserve), the distribution shall be made by an amendment to Schedule 1 of the New Globalstar LLC Agreement. The Disbursing Agent shall coordinate with New Globalstar to amend Schedule 1 to the New Globalstar LLC Agreement, as of the date of the initial distribution of Membership Interests, to set forth the distribution of Membership Interests among holders of Allowed Claims pursuant to Sections III.A.1(f), III.B.4 and III.B.5 and to the Disputed Claims Reserve.

The Disbursing Agent shall coordinate with New Globalstar to amend Schedule 1 to the New Globalstar LLC Agreement, as of each Quarterly Distribution Date, to reflect any required distribution of Membership Interests to holders of Allowed Claims entitled to receive Membership Interests pursuant to Sections III.B.4 and III.B.5, including distributions to be made pursuant to Section VI.D.1(c) (relating to Total Release-Based Membership Interests), Section VI.D.2(c) (relating to undeliverable distributions), and Section VII.C (relating to the allowance or disallowance of Disputed Claims).

The Disbursing Agent shall provide written notice to each holder of an Allowed Claim (as of the Distribution Record Date), on the initial date of distribution of Membership Interests or as soon thereafter as is practicable (but not less than five Business Days after such distribution) of the Membership Interest such holder received. On each Quarterly Distribution Date, the Disbursing Agent shall provide written notice to each holder of an Allowed Claim as of such date of the Membership Interest(s) such holders received on the relevant Quarterly Distribution Date, as reflected in any amendment to Schedule 1 of the New Globalstar LLC Agreement. Each such notice also shall set forth such holder's aggregate Membership Interest(s) (expressed as a percentage of all such Membership Interests).

Each holder of an Allowed Claim entitled to receive a distribution of a Membership Interest shall be deemed to have received such Membership Interest upon amendment to Schedule 1 of the New Globalstar LLC Agreement, whether or not such holder has received notice thereof from the Disbursing Agent.

Except as otherwise provided in Section VI.D.1(c), the initial distribution of Membership Interests and proceeds of the sale of the GSH Interest, if any, other than Supplemental Release-Based Membership Consideration shall be made to holders of Allowed General Unsecured Claims and Allowed Loral Claim, as of the Distribution Record Date, on the Effective Date or as soon thereafter as is practicable. The Membership Interests and proceeds of the sale of the GSH Interest, if any (including Supplemental Release-Based Consideration) not distributed to such holders shall be distributed to the Disputed Claims Reserve.

Distributions on account of Claims that become Allowed Claims after the Effective Date will be made pursuant to Section VII.C.2. Distributions on account of the proceeds of the sale of the GSH Interest, Total Release-Based Membership Interests or any other Membership Interests will be made in accordance with the provisions governing such distributions (including those set forth in this Section VI.A).

### B. Method of Distributions to Holders of Claims and Interests

The Disbursing Agent will make all distributions required under the Plan. The Disbursing Agent will serve without bond, and may employ or contract with other Entities to make or assist in making the distributions required by the Plan.

### C. Compensation and Reimbursement for Services Related to Distributions

Any Disbursing Agent (other than New Globalstar) providing services related to distributions pursuant to the Plan will receive from New Globalstar, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred in connection

- 21 -

with such services. These payments will be made on terms agreed to with New Globalstar and will not be deducted from distributions to be made pursuant to the Plan to holders of Allowed Claims receiving distributions.

## D.    Delivery of Distributions and Undeliverable or Unclaimed Distributions

### 1.    Delivery of Distributions

a.    Generally

Except as otherwise provided in this Section VI.D.1 and Section VI.D.2, distributions to holders of Allowed Claims will be made by a Disbursing Agent: (i) at the addresses set forth on the respective proofs of Claim filed by holders of such Claims; (ii) at the addresses set forth in any written certification of address change delivered to the Disbursing Agent (including pursuant to a letter of transmittal delivered to a Disbursing Agent) after the date of filing of any related proof of Claim; or (iii) at the addresses reflected in the applicable Debtor's Schedules if no proof of Claim has been filed and the Disbursing Agent has not received a written notice of a change of address. To effect the distribution of Membership Interests among holders of Allowed Claims entitled to receive such Membership Interests pursuant to the Plan, the Disbursing Agent shall provide the written notice described in Section VI.A to each such holder at the address set forth in the preceding sentence.

b.    Special Provisions for Distributions to Holders of Senior Note Claims

Subject to the requirements of Section VI.I and Section IV.D, distributions to holders of Allowed Senior Note Claims will be made by the Disbursing Agent to the DTC Participants as of the Distribution Record Date, as identified on a record holder register to be provided to the Disbursing Agent by the Indenture Trustee as soon as practicable after the Effective Date. This record holder register will provide the name, address, and holdings of each respective registered holder of Senior Notes as of the Distribution Record Date. Each entry on the record holder register will be treated as an Allowed Senior Note Claim for purposes of distributions made pursuant to the Plan. The Disbursing Agent and the Indenture Trustee shall be authorized and entitled to recognize and deal for all purposes under the Plan with the record holders set forth on the record holder register, and the DTC Participants will be the owners of the Membership Interests distributed pursuant to Section III.B.4.

Notwithstanding anything to the contrary contained in Section VI.E, the distribution of Standard Release-Based Consideration and Supplemental Release-Based Consideration, if applicable, to holders of Allowed Senior Note Claims shall be made to the DTC Participants submitting the Ballots for which such consideration is being provided in accordance with Section VI.D.1(c).

c.    Special Provisions Related to Certain Holders Entitled to Standard Release-Based Consideration and Supplemental Release-Based Consideration

Each holder of an Allowed General Unsecured Claim may be entitled, in certain circumstances, to receive Standard Release-Based Consideration and Supplemental Release-Based Consideration, if applicable, pursuant to the terms and conditions of this Section VI.D.1(c).

(i)    If the Confirmation Order does not bind all holders of Allowed General Unsecured Claims to the Third Party Release, then each holder of an Allowed General Unsecured Claim bound by the Third Party Release shall receive its Pro Rata share of the Standard Release-Based Consideration.

(ii)    If the Confirmation Order binds all holders of Allowed General Unsecured Claims to the Third Party Release, no distribution of the Standard Release-Based Consideration shall be made before the date that is the Business Day that follows the Business Day that is, or is the first Business Day that follows, the tenth day after entry of the Confirmation Order.

- 22 -

a.      If the Confirmation Order continues to bind all holders of General Unsecured Claims to the Third Party Release when it becomes a Final Order, and it becomes a Final Order on or before the earliest date to make an initial distribution of Standard Release-Based Consideration described in Section VI.D.1(c)(ii), each holder of an Allowed General Unsecured Claim shall be entitled to receive, (a) as soon as practicable after such initial distribute date, its Pro Rata share of the Standard Release-Based Membership Interest and (b) its Pro Rata share of the Standard Release-Based GSHI Proceeds, if any.

b.      (x) If the Confirmation Order binds all holders of General Unsecured Claims to the Third Party Release but it has not become a Final Order on or before the earliest date to make an initial distribution of Standard Release-Based Consideration described in Section VI.D.1(c)(ii), each holder of an Allowed General Unsecured Claim irrevocably bound by the Third Party Release shall be entitled to receive, (a) as soon as practicable after such initial distribute date, its Pro Rata share of the Standard Release-Based Membership Interest and (b) its Pro Rata share of the Standard Release-Based GSHI Proceeds, if any; provided, however, that in calculating the Pro Rata share of the Standard Release-Based Consideration, the holder of each General Unsecured Claim not then irrevocably bound by the Third Party Release will also be included in the denominator of the applicable definition of Pro Rata.

(y) If the Confirmation Order continues to bind all holders of General Unsecured Claims against the Debtors to the Third Party Release when it becomes a Final Order, each holder of an Allowed General Unsecured Claim shall be entitled to receive (i) Membership Interests equal to the excess of (a) its Pro Rata share of the Standard Release-Based Membership Interest over (b) the Membership Interests acquired by such holder of an Allowed General Unsecured Claim pursuant to Section VI.D.1(c)(ii)(b)(x) above, and (ii) proceeds of the sale of the GSH Interest, if any, equal to the excess of (a) its Pro Rata Share of the Standard Release-Based GSHI Proceeds over (b) the proceeds of the sale of the GSHI Interest acquired by such holder of an Allowed General Unsecured Claim pursuant to Section VI.D.1(c)(ii)(b)(x) above.

c.      If the Confirmation Order does not bind all holders of Claims against and Interests in the Debtors to the Third Party Release when the Confirmation Order becomes a Final Order, then the allocation of the remaining Standard Release-Based Consideration shall be made in accordance with Section VI.D.1(c)(i) only to holders who are bound to the Third Party Release.

(iii)   If a SLC Settlement Event occurs on or before the first anniversary of the Effective Date, each holder of an Allowed Loral Claim shall receive its share of the Supplemental Release-Based Consideration, which shall be distributed to the Loral Entities as agreed to by such parties.

(iv)    If a SLC Settlement Event does not occur on or before the first anniversary of the Effective Date, the Supplemental Release-Based Consideration shall be distributed to the holders of Allowed General Unsecured Claims who are entitled to receive Standard Release-Based Consideration in the same manner as provided under Sections VI.D.1.(c)(i) and (ii).

d.      Special Provisions Related to Loral Claims, Vendor Financing Claims, and Claims of the QUALCOMM Entities, and Commitment Fee Claims.

- 23 -

(i)     Distributions on account of Loral Claims and Loral Vendor Financing
        Claims will be made as directed by Loral. No more than 11 Loral
        Entities or entities holding Loral Vendor Financing Claims (in the
        aggregate) shall be members of New Globalstar on the Effective Date.

(ii)    Distributions on account of Claims of the QUALCOMM Entities will
        be made as directed by QUALCOMM in accordance with the
        QUALCOMM Settlement Agreement. No more than one affiliate of
        QUALCOMM (including QUALCOMM) shall be members of New
        Globalstar on the Effective Date.

(iii)   Distribution on the account of the Commitment Fee Claims will be
        made as directed by the Agent, provided that no more than 4 Creditor
        DIP Lenders or their affiliates shall be members of New Globalstar.

## 2.     Undeliverable Distributions Held by Disbursing Agents

a.      Holding and Investment of Undeliverable Distributions;
Undelivered Membership Interests

(i)     If any distribution to a holder of an Allowed Claim is returned
        to a Disbursing Agent as undeliverable, no further
        distributions will be made to such holder unless and until the
        applicable Disbursing Agent is notified by written certification
        of such holder's then-current address. Subject to Section VI.I,
        undeliverable distributions will remain in or be allocated to the
        Disputed Claims Reserve pursuant to this Section VI.D.2(a)
        until such time as a distribution becomes deliverable. Any
        undeliverable Cash (including dividends or other distributions
        on account of an undeliverable Member Interest) will be held
        in a segregated bank account in the name of the applicable
        Disbursing Agent for the benefit of the potential claimants of
        such funds. Any Disbursing Agent holding undeliverable
        Cash will invest such Cash in a manner consistent with New
        Globalstar's investment and deposit guidelines.       An
        undeliverable Membership Interest will be allocated to the
        Disputed Claims Reserve for the benefit of the potential
        claimants of such securities.

(ii)    Prior to closing of the Chapter 11 Case, on each anniversary of
        the Effective Date that undeliverable distributions are being
        held on behalf of holders of Claims, the Disbursing Agent will
        file with the Bankruptcy Court a list identifying all such
        holders.

b.      After Distributions Become Deliverable

On each Quarterly Distribution Date, the Disbursing Agent will make all distributions that become
deliverable to holders of Allowed Claims during the preceding calendar quarter. Each such distribution will include,
to the extent applicable, a Pro Rata share of dividends or other distributions, if any (in each case, net of applicable
taxes, if any, payable by the Disbursing Agent in respect thereof), that were previously paid to the Disbursing Agent
in respect of any Membership Interests included in such distribution.

c.      Failure to Claim Undeliverable Distributions

- 24 -

Any holder of an Allowed Claim that does not assert a claim pursuant to the Plan for an undeliverable distribution to be made by a Disbursing Agent within two years after the Effective Date will have its claim for such undeliverable distribution discharged and will be forever barred from asserting any such claim against the Debtors, New Globalstar, the Disbursing Agent or their property. In such cases with respect to Allowed General Unsecured Claims (i) Membership Interests and Cash will be retained for redistribution to holders of Allowed General Unsecured Claims, and Allowed Loral Claims, and to the extent the holder of a Commitment Fee Claim is entitled to a distribution in accordance with Section III.A.1.f, holders of Allowed Commitment Fee Claims, pursuant to Section VII.C, and (ii) for purposes of this redistribution, each Allowed Claim for which such distributions are undeliverable will be deemed disallowed in its entirety. In such cases with respect to Allowed Claims in any other Class, unclaimed Cash will become property of New Globalstar, free of any restrictions thereon. Nothing contained in the Plan will require any Debtor or Disbursing Agent to attempt to locate any holder of an Allowed Claim.

E.  **Distributions to Holders of Record on the Distribution Record Date**

As of the close of business on the Distribution Record Date, the claims register and the respective transfer or record holder registers for the Senior Notes (as maintained by the Depository), as applicable, shall be closed with respect to all Claims and there shall be no further changes in the record holder of any Claim. The Disbursing Agent shall have no obligation to recognize any transfer or sale of any Claim occurring after the Distribution Record Date. The Disbursing Agent shall instead be authorized and entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the claims register or identified on the transfer or record holder register, as applicable, as of the close of business on the Distribution Record Date as provided to the Disbursing Agent, except as provided in Section VI.D.1(b) with respect to Total Release-Based Consideration, if any, to be distributed to holders of Allowed Senior Note Claims.

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 and for which the notice of transfer appears on the docket of the Bankruptcy Court on or prior to the Distribution Record Date will be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

F.  **Means of Cash Payments**

Except as otherwise specified herein, Cash payments made pursuant to the Plan will be in U.S. currency by checks drawn on a domestic bank selected by the Disbursing Agent or, at the option of the Disbursing Agent, by wire transfer from a domestic bank; provided, however, that Cash payments to foreign holders of Allowed Claims may be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

G.  **Timing and Calculation of Amounts To Be Distributed**

1.  **Business Day**

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

2.  **Rounding**

Notwithstanding any other provision of the Plan, the Membership Interest allocated to holder of an Allowed Claim pursuant to Article III may be rounded to the nearest 5th decimal place, when the Membership Interests are expressed as a percentage.

### 3. Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, each Disbursing Agent will comply with all Tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan will be subject to such withholding and reporting requirements. Each Disbursing Agent will be authorized to take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including but not limited to requiring recipients to fund the payment of such withholding as a condition to delivery or entering into arrangements for the sale (subject to the terms and conditions of the New Globalstar LLC Agreement) of a whole or part of a Membership Interest otherwise to be distributed to a recipient subject to a withholding requirement in order to generate net proceeds sufficient to fund the payment of any such withholding.

Notwithstanding any other provision of the Plan, each Entity receiving a distribution of Cash or a Membership Interest pursuant to the terms hereof will have sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed on it by any governmental unit on account of such distribution, including income, withholding, and other Tax obligations.

### H. Setoffs

Except with respect to claims of a Debtor released pursuant to Section XII or otherwise, the Disbursing Agent may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Claim (before any distribution is made on account of such Claim) the claims, rights, and causes of action of any nature that the Disbursing Agent or New Globalstar may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect a setoff nor the allowance of any Claim hereunder will constitute a waiver or release by the Disbursing Agent or New Globalstar of any claims, rights, and causes of action that the Disbursing Agent or New Globalstar may possess against such a holder of a Claim.

### I. Surrender of Canceled Instruments or Securities

Except as otherwise provided, as a condition precedent to receiving any distribution pursuant to the Plan on account of an Allowed Claim evidenced by note certificates, stock certificates or other written instruments or other documentation canceled pursuant to Section IV.D, the holder of such Claim must tender, as specified in this Section VI.I, the applicable certificates, instruments, or other documentation evidencing such Claim to the applicable Disbursing Agent, together with any letter of transmittal required by such Disbursing Agent. Pending such surrender, any distributions pursuant to the Plan on account of any such Claim will be treated as an undeliverable distribution pursuant to Section VI.D.2.

#### 1. Tender of Senior Note Certificates

Except as provided in Section VI.I.2 for lost, stolen, mutilated or destroyed Senior Note certificates, and Sections VI.I.4, VI.I.5, and VI.I.6, each holder of an Allowed Senior Note Claim must tender the applicable Senior Note certificates to the applicable Disbursing Agent with a letter of transmittal to be provided to such holder by the Disbursing Agent as promptly as practicable following the Effective Date. The letter of transmittal will include, among other provisions, customary provisions with respect to the authority of the holder of the applicable Senior Note certificates to act and the authenticity of any signatures required thereon. All surrendered Senior Note certificates will be marked as canceled.

#### 2. Lost, Stolen, Mutilated or Destroyed Senior Notes Certificate

Any holder of an Allowed Senior Note Claim with respect to which the underlying Senior Note certificate has been lost, stolen, mutilated, or destroyed must, in lieu of surrendering such Senior Note, deliver to the applicable Disbursing Agent: (a) evidence satisfactory to the Disbursing Agent of the loss, theft, mutilation, or destruction, and (b) such security or indemnity as may be required by the Disbursing Agent to hold the Disbursing Agent and the Debtors, as applicable, harmless from any damages, liabilities, or costs incurred in treating such

- 26 -

individual as a holder of a Senior Note. Upon compliance with this Section VI.I.2 by a holder of an Allowed Senior Note Claim, such holder will, for all purposes under the Plan, be deemed to have surrendered the applicable Senior Note certificate.

### 3.      Failure to Surrender Senior Note Certificates

Except as otherwise provided below, any holder of an Allowed Senior Note Claim that fails to surrender or be deemed to have surrendered the applicable Senior Note certificates(s) within two years after the Effective Date will have its right to distributions pursuant to the Plan on account of such Senior Note Claim discharged and will be forever barred from asserting any such Claim against the Debtors, New Globalstar or their property. In such case, any Cash or Membership Interest held for distribution for the benefit of the holder of such Senior Note Claim will be treated pursuant to the provisions set forth in Section VII.C.

### 4.      Senior Note Certificates in the Name and Custody of CEDE & Co.

With respect to any Senior Note certificate held in the name and custody of CEDE & Co., as nominee of the Depository, the foregoing provisions of this Section VI.I will not apply; however, the Disbursing Agent will coordinate with the Depository to obtain such Senior Note certificate substantially in accordance with the procedures contemplated by such provisions. Any such Senior Note certificate will be marked "Cancelled" by the Disbursing Agent.

### 5.      Senior Note Certificates in the Name, but not the Custody, of CEDE & Co.

With respect to any Senior Note certificate held in the name of CEDE & Co. but in the custody of the Indenture Trustee, in lieu of the procedures contemplated in the foregoing provisions of this Section VI.I, the Disbursing Agent will obtain such Senior Note certificates from the Indenture Trustee and will coordinate a mandatory exchange of the Senior Notes evidenced by such certificate for a Membership Interest in accordance with the Plan and instructions received from the Depository. Any such Senior Note certificate will be marked "Cancelled" by the Disbursing Agent.

### 6.      Uncertificated Senior Notes in the Name of CEDE & Co.

With respect to any uncertificated Senior Note held in the name of CEDE & Co., as evidenced by the applicable record holder register retained by the Indenture Trustee, the Disbursing Agent will coordinate a mandatory exchange of such Senior Notes for a Membership Interest in accordance with the Plan and instructions received from the Depository.

### 7.      Note Certificates Other Than Senior Note Certificates, Stock Certificates, Instruments and Other Written Documents

As a condition precedent to receiving any distribution pursuant to the Plan on account of an Allowed Claim evidenced by note certificates (other than Senior Note certificates), stock certificates or other written instruments or other documentation canceled pursuant to Section IV.D, the applicable Disbursing Agent may, prior to 10 Business Days after the later of the Effective Date or the date such Claim becomes an Allowed Claim, require the holder of such Allowed Claim to tender the applicable certificates, instruments, or other documentation evidencing such Claim, together with any letter of transmittal required by such Disbursing Agent. Pending such surrender, any distributions pursuant to the Plan on account of any such Claim will be treated as an undeliverable distribution pursuant to Section VI.D.2. Any holder of such an Allowed Claim with respect to which the underlying certificate, instrument or other documentation has been lost, stolen, mutilated, or destroyed must, in lieu of surrendering such certificate, instrument or other documentation, deliver to the applicable Disbursing Agent: (a) evidence satisfactory to the Disbursing Agent of the loss, theft, mutilation, or destruction, and (b) such security or indemnity as may be required by the Disbursing Agent to hold the Disbursing Agent, New Globalstar, and the Debtors, as applicable, harmless from any damages, liabilities, or costs incurred in treating such individual as a holder of a Claim. Upon compliance with this Section VI.I.7 by a holder of an Allowed Claim, such holder will, for all purposes under the Plan, be deemed to have surrendered the applicable certificate, instrument or other documentation.

- 27 -

**8.    Limitation on Distributions in respect of Senior Notes held in the name of CEDE & Co.**

Distributions made in respect of Senior Notes held in the name of CEDE & Co. will be made in accordance with the Plan and instructions received from the Depository; provided, however, that, if under the rules of the Depository, Membership Interests are not eligible to be held in the name of CEDE & Co., distributions of Membership Interests (including Membership Interests to be distributed upon exercise of a Series A Right or a Series B Right) made in respect of Senior Notes held in the name of CEDE & Co. will be made, directly or indirectly through CEDE & Co., to the DTC Participants in accordance with the instructions of the Depository and in no event will such distributions be made to the beneficial holders of Senior Notes held in street name; provided further that, following such distribution, the transfer of Membership Interests held in the name of the DTC Participants, as the case may be, will be subject to the restrictions on the transfer of Membership Interests contained in the New Globalstar LLC Agreement.

## ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS UNDER THIS PLAN

### A.    Prosecution of Objections

On and after the Effective Date, GCC (and subsequent to its dissolution, New Globalstar) will have the authority and exclusive right to file, settle, compromise, withdraw or litigate to judgment objections to the allowance of Claims and Interests, whether arising before or after the Petition Date; provided, however, that any party in interest that has filed an objection to the allowance of a Claim prior to the Confirmation Date shall have concurrent authority to prosecute such objection. On and after the Effective Date, GCC (and subsequent to its dissolution, New Globalstar) shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Claims or compromise, settle or otherwise resolve Disputed Claims without approval of the Bankruptcy Court; provided, however, that to the extent a party in interest has filed an objection to the allowance of a Claim prior to the Confirmation Date, GCC (and subsequent to its dissolution, New Globalstar) shall either obtain Bankruptcy Court approval for, or obtain the consent of the party before filing the objection to such Claim prior, the allowance of such Disputed Claim. Unless another date is established by order of the Bankruptcy Court, all objections to Claims (other than applications for allowances of compensation and reimbursement of expenses) shall be filed and served 60 days after the later of the Effective Date or the date proof of such Claim or Interests or request for payment of Administrative Claims is filed by the holder thereof.

### B.    No Distributions Pending Allowance

Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of the portion of such Claim that is a Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim, but the payment or distribution provided hereunder shall be made on account of the portion of such Claim that is an Allowed Claim.

### C.    Disputed Claims Reserve

### 1.    Creation of the Disputed Claims Reserve; Initial Distribution

   a.    On the Effective Date, the Debtors will place in the Disputed Claims Reserve maintained by the Disbursing Agent for the benefit of the holders of Disputed Claims and any other Claims that are not Allowed Claims Cash and Membership Interests not distributed as of the Effective Date.

   b.    Following the initial distribution pursuant to Article VI, the Disputed Claims Reserve will contain Cash and the Membership Interest attributable to (i) the Supplemental Release-Based Membership Interest, and (ii) the Membership Interest allocable to holders of Disputed Claims or Claims arising from and after the Effective Date of the Plan, which Claims have not been Allowed. In addition, following the sale of the GSH Interest, the proceeds of such sale will

- 28 -

be placed in the Disputed Claims Reserve and shall be distributed therefrom in accordance with the applicable terms of the Plan.

c.     After the allowance or disallowance of all Claims entitled to receive Cash pursuant to the Plan, any Cash remaining in the Disputed Claims Reserve shall be paid to New Globalstar.

d.     The distributions of Cash and Membership Interests with respect to exercise of the Series A Rights and Series B Rights by holders of Disputed General Unsecured Claims as of the Rights Expiration Time shall be governed by Section VIII.C.

## 2.     Distribution After Allowance or Disallowance of Claims

Payments and distributions to each holder of a Disputed Claim or any other Claim that is not an Allowed Claim, to the extent that such Claim ultimately becomes an Allowed Claim, shall be made in accordance with the provisions of this Plan, including the provision governing the Class of Claims in which such Claim is classified. On the Quarterly Distribution Date following the calendar quarter in which the order or judgment of the Bankruptcy Court allowing any Disputed Claim or any other Claim that is not an Allowed Claim becomes a Final Order or in which, by agreement, any Disputed Claim or any other Claim not previously an Allowed Claim becomes an Allowed Claim, the Disbursing Agent shall distribute or allocate to the holder of such Claim any Cash or a Membership Interest (as applicable) that would have been distributed to such holder if the Claim had been an Allowed Claim on the Effective Date. In the case of a holder of a Disputed Claim entitled to receive a Membership Interest that becomes an Allowed Claim, such distribution shall include a payment in Cash equal to any accrued dividends or other distributions, if any, actually paid to holders of Allowed Claims (in each case, net of applicable taxes, if any, payable by the Disbursing Agent in respect thereof) with respect to the shares held in the Disputed Claims Reserve on account of such holder's Claim.

If as a result of the disallowance of Claims, a Membership Interest no longer needs to be reserved for a Disputed Claim, such Membership Interest shall be treated and allocated in the same manner as if it were a Base Creditor Membership Interest, Standard Release-Based Membership Interest, or Supplemental Release-Based Membership Interest, as the case may be, and allocated as if such Membership Interest had been distributed to holders of Allowed Claims or reserved on account of remaining Disputed Claims in accordance with Section III.B.

## 3.     Additional Distributions on Account of Previously Allowed Claims

On each Quarterly Distribution Date, each holder of a Claim previously Allowed that is entitled a Membership Interest pursuant to the Plan will receive an additional distribution from the Disputed Claims Reserve on account of such Claim equal to (i) the Cash and Membership Interests that such holder would have been entitled to receive on the Effective Date pursuant to Article III after giving effect to the allowance or disallowance of Claims on or before the last day of the calendar quarter preceding the Quarterly Distribution Date minus (ii) the Cash distributed and Membership Interest previously allocated on account of the Claim. Each additional distribution also will include: (i) any dividends or other distributions, if any, made on account of the Membership Interests included in such distribution; and (ii) any proceeds from the investment of the dividends or distributions referred to in clause (i) (in each case, net of applicable taxes, if any, payable by the Disbursing Agent in respect thereof).

Notwithstanding the foregoing, the Disbursing Agent shall not be required to make any distribution on any Quarterly Distribution Date if the Disbursing Agent determines, in its reasonable discretion, that making such distribution would not be cost efficient. Any distribution to a holder of a Claim that has not been made shall be retained for distribution on the next Quarterly Distribution Date for which such distribution is cost-efficient or such time as all Claims have been allowed or disallowed. After the allowance or disallowance of all Claims, the Disbursing Agent will allocate any Membership Interest remaining in the Disputed Claims Reserve to Allowed Claims.

- 29 -

4. **Additional Provisions for Distribution of Standard Release-Based Consideration and Supplemental Release-Based Consideration**

   a. If the Confirmation Order binds all holders of General Unsecured Claims against the Debtors to the Third Party Release, but such Confirmation Order is not final on or before the date of the initial distribution of the Standard Release-Based Membership Interest, the Standard Release-Based Consideration otherwise allocable to the holders of the General Unsecured Claims not irrevocably bound by the Third Party Release shall be allocated to the Disputed Claims Reserve. When the Confirmation Order becomes a Final Order, the Standard Release-Based Consideration in the Disputed Claims Reserve shall be allocated in accordance with Section VI.D.1(c)(ii).

   b. The Supplemental Release-Based Consideration shall be allocated to the Disputed Claims Reserve. If a SLC Settlement Event occurs on or before the first anniversary of the Effective Date, the Supplemental Release-Based Consideration in the Disputed Claim Reserve shall be allocated to holders of Allowed Loral Claims so as to effectuate Section VI.D.1(c)(iii). If, on the other hand, an SLC Settlement Event does not occur on or before the first anniversary of the Effective Date, the Supplemental Release-Based Consideration in the Disputed Claims Reserve shall be distributed to holders of Allowed General Unsecured Claims who are entitled to receive Standard Release-Based Consideration in accordance with Sections VI.D.1(c)(i), (ii) and (iv).

## 5. Estimation

For purposes of effectuating the reserve provisions of the Plan and the allocations and distributions to holders of Allowed Claims entitled to receive a Membership Interest, the Debtors may request prior to, or the Disbursing Agent may request after, the Effective Date that the Bankruptcy Court, pursuant to section 502 of the Bankruptcy Code, fix or liquidate the amount of any contingent or unliquidated General Unsecured Claim not otherwise treated under this Plan or, in lieu thereof, the Bankruptcy Court may determine the maximum contingent or unliquidated amount for such Claim.

## 6. Dividends and Distributions

Cash dividends and other distributions on account of a Membership Interest held in the Disputed Claims Reserve will be distributed to the Disputed Claims Reserve concurrently with the transfer of such dividends and other distributions to other holders of the Membership Interests. Cash held in the Disputed Claims Reserve as a result of such dividends and other distributions will be deposited in a segregated bank account maintained by the Disbursing Agent and held in trust pending distribution by the applicable Disbursing Agent for the benefit of holders of Disputed Claims. The Disbursing Agent will invest the Cash held in the Disputed Claims Reserve in a manner consistent with the Disbursing Agent's investment and deposit guidelines. The applicable Disbursing Agent also will place in the Disputed Claims Reserve the proceeds from such investment of Cash (net of applicable taxes, if any, payable by the Disbursing Agent in respect thereof).

## 7. Recourse

Each holder of an Allowed Claim (or a Disputed Claim that ultimately becomes an Allowed Claim) will have recourse only to the undistributed Cash and the unallocated Membership Interests held in the Disputed Claims Reserve for satisfaction of the distributions or allocations to which holders of Allowed Claims are entitled hereunder, and not to the Debtors, New Globalstar, their property, or any assets previously distributed on account of any Allowed Claim or to the Disbursing Agent.

- 30 -

## 8. Tax Reporting and Other Matters

Under section 468B(g) of the Internal Revenue Code, title 26 of the United States Code, amounts earned by an escrow account, settlement fund or similar fund must be subject to current tax. Although certain Treasury Regulations have been issued under this Section, no Treasury Regulations have as yet been promulgated to address the tax treatment of such accounts established to satisfy claims similar to the Disputed Claims in Classes 4 and 5. Treasury Regulations have been proposed that would establish, if finalized in their current form, the tax treatment of reserves of a type similar to those involved here. In general, such Treasury Regulations would subject such a reserve to a separate entity-level tax in a manner similar to a "qualified settlement fund" governed by Treasury Regulation sections 1.468B-1 et seq. As to reserves established prior to the proposed Treasury Regulations becoming final, the proposed Treasury Regulations provide that the IRS would not challenge any reasonable, consistently applied method of taxation for income earned by the reserve and any reasonable, consistently applied method for reporting such income.

Absent definitive guidance from the IRS or a court of competent jurisdiction to the contrary and subject to the issuance of definitive guidance, the Disbursing Agent will (a) treat the Disputed Claims Reserve as disputed ownership funds for federal income tax purposes in accordance with the proposed Treasury Regulations under Section 1.468B-9 (b) to the extent permitted by applicable law, report consistently for federal, state and local income tax purposes. In addition, pursuant to the Plan, holders of Disputed Claims must report consistently with such treatment.

The Disbursing Agent will report, as subject to a separate entity level tax, any amounts earned by the Disputed Claims Reserves and will pay the Tax thereon.

In general, distributions from a Disputed Claims Reserve will be made, net of any taxes paid with respect to earnings of the Disputed Claims Reserve that are included in the distribution, to holders of Disputed Claims when such Claims become allowed as provided in the Plan.

If the Disputed Claims Reserve has insufficient funds to pay any applicable taxes imposed upon it or its assets, New Globalstar will advance to the Disputed Claims Reserve any funds necessary to pay such taxes, with each such tax advance repayable upon request of New Globalstar (including by way of deduction or, subject to the terms of the New Globalstar LLC Agreement, sale of Membership Interests) from future amounts received by the Disputed Claims Reserve in accordance with the following procedures. Prior to any Cash being distributed from the reserve to any holder following the resolution of a Disputed Claim, such Cash will first be applied against the pro rata portion of any outstanding tax advance attributable to the resolved Claim. If there is instead to be made to such holder a distribution of other property, the holder will as a condition to receiving such property have 30 Business Days in which to pay in Cash to the Disbursing Agent an amount equal to its pro rata portion of the unsatisfied portion of such tax advance. If a payment in full in Cash is not received in such 30 Business Day period, the Disbursing Agent will be entitled to reduce and permanently adjust the property that would otherwise be distributed to such holder accordingly. If a Disputed Claim is not Allowed, the holders of Allowed General Unsecured Claims, will as a condition to receiving an increased Membership Interest or other property, have 30 Business Days in which to pay in Cash to the Disbursing Agent an amount equal to their pro rata portion of the unsatisfied portion of such tax advance. If a payment in full in Cash is not received in such 30 Business Day period, the Disbursing Agent will be entitled to reduce and permanently adjust the property that would otherwise be distributed to such holder accordingly.

## ARTICLE VIII. EXERCISE OF RIGHTS TO ACQUIRE ADDITIONAL MEMBERSHIP INTERESTS

The following procedures shall apply to the Series A Rights and Series B Rights. The Debtors, the Disbursing Agent (other than New Globalstar), and, with respect to Section VIII.C, New Globalstar, are authorized to adopt such additional detailed procedures not inconsistent with the following provisions of this Article VIII to more efficiently administer the exercise of the Series A Rights and Series B Rights.

### A. Procedures for Exercise of Series A Rights by Undisputed Holders

- 31 -

Each Series A Right may be exercised by an Undisputed Holder thereof at any time prior to the Rights Expiration Time. An Undisputed Holder of a Series A Right may exercise all or any portion of such holder's Series A Right pursuant to a Series A Primary Exercise. If an Undisputed Holder has more than one Series A Right, all Series A Rights that are to be exercised by such holder pursuant to a Series A Primary Exercise must be exercised concurrently. Any Undisputed Holder of a Series A Right that seeks to acquire all of its Pro Rata share of the Series A Rights Consideration pursuant to a Series A Primary Exercise may also seek to acquire all or any portion of the remaining Series A Rights Consideration by means of a Series A Oversubscription Exercise. Any exercise of Series A Rights pursuant to a Series A Primary Exercise or a Series A Oversubscription Exercise will be irrevocable, and any exercise of a Series A Oversubscription Exercise will be subject to prorationing as provided in this Section VIII.A in the event that the Membership Interests sought to be acquired pursuant to Series A Primary Exercises and Series A Oversubscription Exercises exceed the Membership Interests comprising the Series A Rights Consideration available for distribution to Undisputed Holders after the application of Section VIII.C.

In order for any Series A Primary Exercise and any related Series A Oversubscription Exercise of a Series A Right to be valid and effective, the Undisputed Holder of the Series A Right seeking to effect such Series A Primary Exercise and related Series A Oversubscription Exercise, if applicable, must deliver to the Disbursing Agent prior to the Rights Expiration Time a properly completed and duly executed Series A Exercise Notice which (a) indicates the portion of the Series A Rights Consideration sought to be acquired pursuant to a Series A Primary Exercise and the portion, if any, of the Series A Right Consideration sought to be acquired pursuant to a Series A Oversubscription Exercise and (b) is accompanied by a check or bank draft drawn on a United States bank or wire transfer in an amount equal to the sum of (i) the product of the Series A Rights Exercise Price and the number of 0.0001% Membership Interests included in the Series A Rights Consideration sought to be acquired pursuant to the Series A Primary Exercise and (ii) the product of the Series A Rights Exercise Price and the number of 0.0001% Membership Interests included in the Series A Rights Consideration sought to be acquired pursuant to the Series A Oversubscription Exercise. The foregoing items will not be deemed to have been timely delivered to the Disbursing Agent (and thus the attempted exercise of a Series A Right pursuant to a Series A Primary Exercise and/or a Series A Oversubscription Exercise will not be valid or effective) unless they are actually received by the Disbursing Agent at the address specified therefor in the Series A Exercise Notice prior to the Rights Expiration Time and are completed and executed in accordance with the instructions thereto.

As promptly as practicable (and, in any event, not later than ten Business Days) following the Rights Expiration Time, the Disbursing Agent will mail to each Undisputed Holder of a Series A Right that has sought to exercise its Series A Right in a Series A Primary Exercise and/or Series A Oversubscription Exercise an initial written statement specifying the portion of the Series A Rights Consideration that was validly and effectively acquired by such holder (after giving effect, if applicable, to prorationing pursuant to this Section VIII.A) and the effect of the application of Section VIII.C, together with a check in the amount being refunded (without interest) in respect of Series A Rights Exercise Price not applied to the acquisition of Series A Rights Consideration as a result of ineffective exercise by such holder due to untimeliness or noncompliance with the requirements specified in this Section VIII.A or in instructions contained in the Series A Exercise Notice or prorationing pursuant to this Section VIII.A, or otherwise. Thereafter, as promptly as practicable (and, in any event, not later than ten Business Days) following each Quarterly Distribution Date, the Disbursing Agent will, to the extent applicable, mail to each Undisputed Holder of a Series A Right that has sought to exercise its Series A Right in a Series A Primary Exercise and/or Series A Oversubscription Exercise (a) a written statement specifying any increase in Membership Interests validly and effectively acquired by such holder (after giving effect, if applicable, to prorationing pursuant to this Section VIII.A) as a result of the application of Section VIII.C and/or (b) a check in any amount being refunded (without interest) in respect of Series A Rights Exercise Price that will not be applied to the acquisition of Series A Rights Consideration as a result of the application of Section VIII.C. The actual portion of Series A Rights Consideration that will be acquired upon exercise of Series A Rights will be subject to rounding in accordance with Section VI.G.2.

In the event that the Membership Interests sought to be acquired pursuant to Series A Primary Exercises and Series A Oversubscription Exercises exceed the actual amount of Membership Interests comprising the Series A Rights Consideration available for distribution to Undisputed Holders after the application of Section VIII.C, (a) all Membership Interests that shall have otherwise been validly and effectively acquired by Undisputed Holders pursuant to Series A Primary Exercises shall be deemed to have been validly and effectively acquired and (b) the Membership Interests that shall be deemed to have been validly and effectively acquired by any particular

- 32 -

Undisputed Holder of a Series A Right pursuant to a Series A Oversubscription Exercise (assuming all other requirements for valid and effective exercise shall have been satisfied) shall be determined by multiplying (i) the portion of the Membership Interests comprising the Series A Rights Consideration available for distribution to Undisputed Holders after the application of Section VIII.C that was not validly and effectively acquired pursuant to Series A Primary Exercises by (ii) a fraction, the numerator of which shall be the Membership Interests sought to be acquired by such Undisputed Holder pursuant to Series A Oversubscription Exercise and the denominator of which will be the Membership Interests sought to be acquired by all Undisputed Holders of Series A Rights pursuant to Series A Oversubscription Exercise.

In order to facilitate the exercise of the Series A Rights, the Disbursing Agent will mail on, or as promptly as practicable (but, in any event, no later than ten Business Days) following, the Effective Date to each Undisputed Holder existing as of the Distribution Record Date a form of the Series A Exercise Notice (which will include instructions for the proper completion, due execution and timely delivery thereof, together with payment of the applicable Series A Exercise Price for the portion of the Series A Rights Consideration sought to be acquired, to the Disbursing Agent and may specify other requirements relating to the valid and effective exercise of a Series A Right).

All determinations as to proper completion, due execution, timeliness, eligibility, prorationing and other matters affecting the validity or effectiveness of any attempted exercise of any Series A Right shall be made by the Disbursing Agent, whose good faith determination shall be final and binding. The Disbursing Agent, in its good faith determination, may waive any defect or irregularity, permit a defect or irregularity to be cured within such time as it may determine in good faith to be appropriate or reject the purported exercise of any Series A Right suffering from any such defect or irregularity. Deliveries required to be received by the Disbursing Agent in connection with a purported exercise of any Series A Right will not be deemed to have been so received or accepted until actual receipt thereof by the Disbursing Agent shall have occurred and any defects or irregularities shall have been waived or cured within such time as the Disbursing Agent may determine in good faith to be appropriate. The Disbursing Agent will use its commercially reasonable efforts to give notice of any defect or irregularity in connection with any purported exercise of a Series A Right and permit such defect or irregularity to be cured within such time as it may determine in good faith to be appropriate.

## B.    Procedures for Exercise of Series B Rights by Undisputed Holders

Each Series B Right may be exercised by an Undisputed Holder thereof at any time prior to the Rights Expiration Time. An Undisputed Holder of a Series B Right may exercise all or any portion of such holder's Series B Right pursuant to a Series B Primary Exercise. If an Undisputed Holder has more than one Series B Right, all Series B Rights that are to be exercised by such holder pursuant to a Series B Primary Exercise must be exercised concurrently. Any Undisputed Holder of a Series B Right that seeks to acquire all of its Pro Rata share of the Series B Rights Consideration pursuant to a Series B Primary Exercise may also seek to acquire all or any portion of the remaining Series B Rights Consideration by means of a Series B Oversubscription Exercise. Any exercise of Series B Rights pursuant to a Series B Primary Exercise or a Series B Oversubscription Exercise will be irrevocable, and any exercise of a Series B Oversubscription Exercise will be subject to prorationing as provided in this Section VIII.B in the event that the Membership Interests sought to be acquired pursuant to Series B Primary Exercises and Series B Oversubscription Exercises exceed the Membership Interests comprising the Series B Rights Consideration available for distribution to Undisputed Holders after the application of Section VIII.C.

In order for any Series B Primary Exercise and any related Series B Oversubscription Exercise of a Series B Right to be valid and effective, the Undisputed Holder of the Series B Right seeking to effect such Series B Primary Exercise and related Series B Oversubscription Exercise, if applicable, must deliver to the Disbursing Agent prior to the Rights Expiration Time a properly completed and duly executed Series B Exercise Notice which (a) indicates the portion of the Series B Rights Consideration sought to be acquired pursuant to a Series B Primary Exercise and the portion, if any, of the Series B Right Consideration sought to be acquired pursuant to a Series B Oversubscription Exercise and (b) is accompanied by a check or bank draft drawn on a United States bank or wire transfer in an amount equal to the sum of (i) the product of the Series B Rights Exercise Price and the number of 0.0001% Membership Interests included in the Series B Rights Consideration sought to be acquired pursuant to the Series B Primary Exercise and (ii) the product of the Series B Rights Exercise Price and the number of 0.0001% Membership Interests included in the Series B Rights Consideration sought to be acquired pursuant to the Series B

- 33 -

Oversubscription Exercise. The foregoing items will not be deemed to have been timely delivered to the Disbursing Agent (and thus the attempted exercise of a Series B Right pursuant to a Series B Primary Exercise and/or a Series B Oversubscription Exercise will not be valid or effective) unless they are actually received by the Disbursing Agent at the address specified therefor in the Series B Exercise Notice prior to the Rights Expiration Time and are completed and executed in accordance with the instructions thereto.

As promptly as practicable (and, in any event, not later than ten Business Days) following the Rights Expiration Time, the Disbursing Agent will mail to each Undisputed Holder of a Series B Right that has sought to exercise its Series B Right in a Series B Primary Exercise and/or Series B Oversubscription Exercise an initial written statement specifying the portion of the Series B Rights Consideration that was validly and effectively acquired by such holder (after giving effect, if applicable, to prorationing pursuant to this Section VIII.B) and the effect of the application of Section VIII.C, together with a check in the amount being refunded (without interest) in respect of Series B Rights Exercise Price not applied to the acquisition of Series B Rights Consideration as a result of ineffective exercise by such holder due to untimeliness or noncompliance with the requirements specified in this Section VIII.B or in instructions contained in the Series B Exercise Notice or prorationing pursuant to this Section VIII.B, or otherwise. Thereafter, as promptly as practicable (and, in any event, not later than ten Business Days) following each Quarterly Distribution Date, the Disbursing Agent will, to the extent applicable, mail to each Undisputed Holder of a Series B Right that has sought to exercise its Series B Right in a Series B Primary Exercise and/or Series B Oversubscription Exercise (a) a written statement specifying any increase in Membership Interests validly and effectively acquired by such holder (after giving effect, if applicable, to prorationing pursuant to this Section VIII.B) as a result of the application of Section VIII.C and/or (b) a check in any amount being refunded (without interest) in respect of Series B Rights Exercise Price that will not be applied to the acquisition of Series B Rights Consideration as a result of the application of Section VIII.C. The actual portion of Series B Rights Consideration that will be acquired upon exercise of Series B Rights will be subject to rounding in accordance with Section VI.G.2.

In the event that the Membership Interests sought to be acquired pursuant to Series B Primary Exercises and Series B Oversubscription Exercises exceed the actual amount of Membership Interests comprising the Series B Rights Consideration available for distribution to Undisputed Holders after the application of Section VIII.C., (a) all Membership Interests that shall have otherwise been validly and effectively acquired by Undisputed Holders pursuant to Series B Primary Exercises shall be deemed to have been validly and effectively acquired and (b) the Membership Interests that shall be deemed to have been validly and effectively acquired by any particular Undisputed Holder of a Series B Right pursuant to a Series B Oversubscription Exercise (assuming all other requirements for valid and effective exercise shall have been satisfied) shall be determined by multiplying (i) the portion of the Membership Interests comprising the Series B Rights Consideration available for distribution to Undisputed Holders after the application of Section VIII.C that was not validly and effectively acquired pursuant to Series B Primary Exercises by (ii) a fraction, the numerator of which shall be the Membership Interests sought to be acquired by such Undisputed Holder pursuant to Series B Oversubscription Exercise and the denominator of which will be the Membership Interests sought to be acquired by all Undisputed Holders of Series B Rights pursuant to Series B Oversubscription Exercise.

In order to facilitate the exercise of the Series B Rights, the Disbursing Agent will mail on, or as promptly as practicable (but, in any event, no later than ten Business Days) following, the Effective Date to each Undisputed Holder existing as of the Distribution Record Date a form of the Series B Exercise Notice (which will include instructions for the proper completion, due execution and timely delivery thereof, together with payment of the applicable Series B Exercise Price for the portion of the Series B Rights Consideration sought to be acquired, to the Disbursing Agent and may specify other requirements relating to the valid and effective exercise of a Series B Right).

All determinations as to proper completion, due execution, timeliness, eligibility, prorationing and other matters affecting the validity or effectiveness of any attempted exercise of any Series B Right shall be made by the Disbursing Agent, whose good faith determination shall be final and binding. The Disbursing Agent, in its good faith determination, may waive any defect or irregularity, permit a defect or irregularity to be cured within such time as it may determine in good faith to be appropriate or reject the purported exercise of any Series B Right suffering from any such defect or irregularity. Deliveries required to be received by the Disbursing Agent in connection with a purported exercise of any Series B Right will not be deemed to have been so received or accepted until actual

- 34 -

receipt thereof by the Disbursing Agent shall have occurred and any defects or irregularities shall have been waived or cured within such time as the Disbursing Agent may determine in good faith to be appropriate. The Disbursing Agent will use its commercially reasonable efforts to give notice of any defect or irregularity in connection with any purported exercise of a Series B Right and permit such defect or irregularity to be cured within such time as it may determine in good faith to be appropriate.

### C. Procedures For Exercise of Series A Rights and Series B Rights by Holders of Disputed General Unsecured Claims as of the Rights Expiration Time

#### 1. Exercise of Series A Rights

The Disbursing Agent will mail a form of Series A Rights Exercise Notice (i) to each holder of a Disputed General Unsecured Claim as of the Distribution Record Date on, or as promptly as practicable (but, in any event, no later than ten Business Days) following the Effective Date, and (ii) to any holder of a Claim timely filed pursuant to Section V.C after the Distribution Record Date as promptly as practicable after such filing. If any such holder becomes an Undisputed Holder prior to the Rights Expiration Time, Section VIII.A will govern such holder's exercise of the Series A Rights. Any such holder that does not become an Undisputed Holder prior to the Rights Expiration Time may seek to acquire Membership Interests comprising the Series A Rights Consideration as contemplated by this Section VIII.C.1. In order to so acquire any such Membership Interests, such holder must deliver to the Disbursing Agent prior to the Rights Expiration Time a properly completed and duly executed Series A Rights Notice which (i) indicates the portion of the Series A Rights Consideration sought to be acquired and (ii) is accompanied by a check or bank draft drawn on a United States bank or wire transfer in an amount equal to the product of the Series A Rights Exercise Price and the number of 0.0001% Membership Interests included in the portion of the Series A Rights Consideration sought to be acquired. All provisions of the last paragraph of Section VIII.A shall apply equally to delivery of a Series A Rights Exercise Notice pursuant to this Section VIII.C.1.

At or immediately prior to the Rights Expiration Time, GCC (and subsequent to its dissolution, New Globalstar) shall determine the aggregate amount of Membership Interests comprising the Series A Consideration that could have been acquired by holders of Disputed General Unsecured Claims upon Series A Primary Exercises if such Claims had been Allowed as of the Rights Expiration Time in amounts determined, in good faith, by GCC (and subsequent to its dissolution, New Globalstar) to be reasonable based on the relevant facts and circumstances of each such Claim.

In the event that the Membership Interests sought to be acquired pursuant to Series A Primary Exercises and Series A Oversubscription Exercises by Undisputed Holders exceed the actual amount of Membership Interests comprising the Series A Rights Consideration, promptly following the Rights Expiration Time there shall be placed in a segregated account: (i) the amount of Membership Interests comprising the Series A Rights Consideration sought to be acquired by holders of Disputed General Unsecured Claims (provided that, in no event, will the amount of Membership Interests placed in such segregated account exceed the amount of Membership Interests determined pursuant to the immediately preceding paragraph), and (ii) the Cash delivered by Undisputed Holders and holders of Disputed General Unsecured Claims in respect of the Membership Interests placed in such segregated account pursuant to clause (i) of this sentence. A portion of such Cash equal to the Series A Exercise Price for the Membership Interests will be delivered to New Globalstar from such segregated account. The Membership Interests and Cash remaining in such segregated account shall be distributed as provided in the next following paragraph.

Promptly following each Quarterly Distribution Date after the Rights Expiration Time, the Disbursing Agent shall determine for each Disputed General Unsecured Claim that was Allowed since the next preceding Quarterly Distribution Date (or, in the case of the first such Quarterly Distribution Date, since the Rights Expiration Time), the amount of Membership Interests comprising the Series A Consideration that could have been acquired by the holder thereof upon a Series A Primary Exercise if such Claim had been so Allowed as of the Rights Expiration Time (assuming all other Disputed General Unsecured Claims that were Allowed since the Rights Expiration Time had also been so Allowed as of the Rights Expiration Time). Each such holder shall then acquire from the segregated account established pursuant to the immediately preceding paragraph an amount of Membership Interests equal to the lesser of (i) the amount of Membership Interests determined pursuant to the immediately preceding sentence, and (ii) the amount of Membership Interests sought to be acquired by such holder pursuant to

- 35 -

this Section VIII.C.1 and the Disbursing Agent shall deliver from the segregated account established pursuant to the immediately preceding paragraph (i) to the Undisputed Holders entitled thereto in accordance with Section VIII.A, Cash in an amount equal to the Series A Exercise Price for the Membership Interests acquired as provided in the immediately preceding sentence and (ii) to such holder, Cash in an amount of equal to the excess of the amount of Cash delivered by such holder to acquire Series A Rights Consideration pursuant to this Section VIII.C over the Series A Exercise Price for the Membership Interests acquired by such holder as provided in this sentence.

Promptly following each Quarterly Distribution Date after the Rights Expiration Time, the Disbursing Agent shall deliver to the holder of any Disputed General Unsecured Claim that was determined not to have been an Allowed Claim since the next preceding Quarterly Distribution Date (or, in the case of the first such Quarterly Distribution Date, since the Rights Expiration Time) Cash from the segregated account established pursuant to the immediately preceding paragraph in an amount equal to the Cash delivered by such holder to acquire Series A Rights Consideration pursuant to this Section VIII.C. After all Disputed General Unsecured Claims have been resolved, and all deliveries contemplated by this Section VIII.C.1 have been made, all Membership Interests and Cash remaining in the segregated account established in the immediately preceding paragraph will be delivered to Undisputed Holders in accordance with Section VIII.A.

As promptly as practicable (and, in any event, not later than 10 Business Days) following each Quarterly Distribution Date, the Disbursing Agent will, to the extent applicable, mail to each holder of a Disputed General Unsecured Claim that was Allowed or determined to be not Allowed since the next preceding Quarterly Distribution Date (or, in the case of the first such Quarterly Distribution Date, since the Rights Expiration Time), (i) a written statement specifying the amount of Membership Interests acquired by such holder pursuant to the immediately preceding paragraph and/or (ii) a check in the amount to be delivered to such holder pursuant to the immediately preceding paragraph.

## 2.    Exercise of Series B Rights

The Disbursing Agent will mail a form of Series B Rights Exercise Notice (i) to each holder of a Disputed General Unsecured Claim as of the Distribution Record Date on, or as promptly as practicable (but, in any event, no later than ten Business Days) following the Effective Date, and (ii) to any holder of a Claim timely filed pursuant to Section V.C after the Distribution Record Date as promptly as practicable after such filing. If any such holder becomes an Undisputed Holder prior to the Rights Expiration Time, Section VIII.B will govern such holder's exercise of the Series B Rights. Any such holder that does not become an Undisputed Holder prior to the Rights Expiration Time may seek to acquire Membership Interests comprising the Series B Rights Consideration as contemplated by this Section VIII.C.2. In order to so acquire any such Membership Interests, such holder must deliver to the Disbursing Agent prior to the Rights Expiration Time a properly completed and duly executed Series B Rights Notice which (i) indicates the portion of the Series B Rights Consideration sought to be acquired and (ii) is accompanied by a check or bank draft drawn on a United States bank or wire transfer in an amount equal to the product of the Series B Rights Exercise Price and the number of 0.0001% Membership Interests included in the portion of the Series B Rights Consideration sought to be acquired. All provisions of the last paragraph of Section VIII.B shall apply equally to delivery of a Series B Rights Exercise Notice pursuant to this Section VIII.C.2.

At or immediately prior to the Rights Expiration Time, GCC (and subsequent to its dissolution, New Globalstar) shall determine the aggregate amount of Membership Interests comprising the Series B Consideration that could have been acquired by holders of Disputed General Unsecured Claims upon Series B Primary Exercises if such Claims had been Allowed as of the Rights Expiration Time in amounts determined, in good faith, by GCC (and subsequent to its dissolution, New Globalstar) to be reasonable based on the relevant facts and circumstances of each such Claim.

In the event that the Membership Interests sought to be acquired pursuant to Series B Primary Exercises and Series B Oversubscription Exercises by Undisputed Holders exceed the actual amount of Membership Interests comprising the Series B Rights Consideration, promptly following the Rights Expiration Time there shall be placed in a segregated account: (i) the amount of Membership Interests comprising the Series B Rights Consideration sought to be acquired by holders of Disputed General Unsecured Claims (provided that, in no event, will the amount of Membership Interests placed in such segregated account exceed the amount of Membership Interests determined pursuant to the immediately preceding paragraph), and (ii) the Cash delivered by Undisputed

- 36 -

Holders and holders of Disputed General Unsecured Claims in respect of the Membership Interests placed in such segregated account pursuant to clause (i) of this sentence. A portion of such Cash equal to the Series B Exercise Price for the Membership Interests will be delivered to New Globalstar from such segregated account. The Membership Interests and Cash remaining in such segregated account shall be distributed as provided in the next following paragraph.

Promptly following each Quarterly Distribution Date after the Rights Expiration Time, the Disbursing Agent shall determine for each Disputed General Unsecured Claim that was Allowed since the next preceding Quarterly Distribution Date (or, in the case of the first such Quarterly Distribution Date, since the Rights Expiration Time), the amount of Membership Interests comprising the Series B Consideration that could have been acquired by the holder thereof upon a Series B Primary Exercise if such Claim had been so Allowed as of the Rights Expiration Time (assuming all other Disputed General Unsecured Claims that were Allowed since the Rights Expiration Time had also been so Allowed as of the Rights Expiration Time). Each such holder shall then acquire from the segregated account established pursuant to the immediately preceding paragraph an amount of Membership Interests equal to the lesser of (i) the amount of Membership Interests determined pursuant to the immediately preceding sentence, and (ii) the amount of Membership Interests sought to be acquired by such holder pursuant to this Section VIII.C.2, and the Disbursing Agent shall deliver from the segregated account established pursuant to the immediately preceding paragraph (i) to the Undisputed Holders entitled thereto in accordance with Section VIII.B, Cash in an amount equal to the Series B Exercise Price for the Membership Interests acquired as provided in the immediately preceding sentence and (ii) to such holder, Cash in an amount of equal to the excess of the amount of Cash delivered by such holder to acquire Series B Rights Consideration pursuant to this Section VIII.C over the Series B Exercise Price for the Membership Interests acquired by such holder as provided in this sentence. Promptly following each Quarterly Distribution Date after the Rights Expiration Time, the Disbursing Agent shall deliver to the holder of any Disputed General Unsecured Claim that was determined not to have been an Allowed Claim since the next preceding Quarterly Distribution Date (or, in the case of the first such Quarterly Distribution Date, since the Rights Expiration Time) Cash from the segregated account established pursuant to the immediately preceding paragraph in an amount equal to the Cash delivered by such holder to acquire Series B Rights Consideration pursuant to this Section VIII.C. After all Disputed General Unsecured Claims have been resolved, and all deliveries contemplated by this Section VIII.C.2 have been made, all Membership Interests and Cash remaining in the segregated account established in the immediately preceding paragraph will be delivered to Undisputed Holders in accordance with Section VIII.B.

As promptly as practicable (and, in any event, not later than 10 Business Days) following each Quarterly Distribution Date, the Disbursing Agent will, to the extent applicable, mail to each holder of a Disputed General Unsecured Claim that was Allowed or determined to be not Allowed since the next preceding Quarterly Distribution Date (or, in the case of the first such Quarterly Distribution Date, since the Rights Expiration Time), (i) a written statement specifying the amount of Membership Interests acquired by such holder pursuant to the immediately preceding paragraph and/or (ii) a check in the amount to be delivered to such holder pursuant to the immediately preceding paragraph.

## ARTICLE IX. SUBSTANTIVE CONSOLIDATION OF THE DEBTORS

Pursuant to the Confirmation Order, the Bankruptcy Court shall approve the substantive consolidation of the Debtors for the purpose of implementing the Plan, including for purposes of voting, Confirmation and distributions to be made under the Plan. Pursuant to such order: (A) all assets and liabilities of Debtors will be deemed merged; (B) all Secondary Liability Claims will be deemed eliminated so that any Claim against any Debtor and any Secondary Liability Claims related thereto will be deemed to be one obligation of the consolidated Debtors; and (C) each and every Claim filed or to be filed in the Chapter 11 Case of any of the Debtors will be deemed filed against the consolidated Debtors and will be deemed one Claim against and a single obligation of the consolidated Debtors.

## ARTICLE X. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.    Conditions to Confirmation

- 37 -

The following are conditions precedent to confirmation of the Plan that must be satisfied or duly waived pursuant to Section X.C:

1.      The Confirmation Order shall be acceptable in all material respects to the Debtors and the Creditors Committee (except that any provision in the Confirmation Order relating to the Standard Release-Based Consideration or the Supplemental Release-Based Consideration or any dispute with respect thereto need not be acceptable to the Creditors Committee).

2.      The Plan shall not have been amended, altered or modified from the Plan as filed on May 3, 2004, unless such amendment, alteration or modification has been consented to in accordance with Section XIV.B.

## B.      Conditions to the Effective Date

The Effective Date will not occur and the Plan will not be consummated unless and until each of the following conditions have been satisfied or duly waived pursuant to Section X.C:

1.      The Plan shall not have been amended, altered or modified from the Plan as filed on May 3, 2004, unless such amendment, alteration or modification has been consented to in accordance with Section XIV.B.

2.      The Clerk of the Bankruptcy Court shall have entered the Confirmation Order, and the implementation of the Confirmation Order has not been stayed.

3.      Any other necessary orders in aid of consummation of the Plan in form and substance agreed to by the Debtors and the Creditors Committee shall have been entered.

## C.      Waiver of Conditions to the Confirmation and Effective Date

The conditions to Confirmation set forth in Sections X.A and the conditions to the Effective Date set forth in Sections X.B may be waived in whole or part by the Debtors at any time without an order of the Bankruptcy Court after five Business Days' written notice of such proposed waiver to, and upon the receipt of the prior written consent of, the Creditors Committee; provided, however, that the Debtors may waive such conditions to Confirmation or conditions to the Effective Date without prior notice to, or the consent of, the Creditors Committee to the extent the failure to satisfy such conditions relates in any manner to the Standard Release-Based Consideration or the Supplemental Release-Based Consideration or any dispute with respect thereto.

## D.      Effect of Nonoccurrence of Conditions to the Effective Date

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Section X.C, then upon motion by the Debtors and the Creditors Committee made before the time that each of such conditions has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated pursuant to this Section X.D: (1) the Plan will be null and void in all respects, including with respect to: (a) the rejections of Executory Contracts and Unexpired Leases pursuant to Article V; and (b) the substantive consolidation of the Debtors; and (2) nothing contained in the Plan will: (a) constitute a waiver or release of any Claims by or against, or any Interest in, the Debtors; or (b) prejudice in any manner the rights of the Debtors or any other party in interest.

## ARTICLE XI.  CRAMDOWN

The Debtors request Confirmation under section 1129(b) of the Bankruptcy Code with respect to any impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Debtors

- 38 -

reserve the right to modify the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification. With respect to Classes 7 and 8, which are deemed to reject the Plan, the Debtors shall utilize the provisions of section 1129(b) of the Bankruptcy Code to satisfy the requirements for confirmation of the Plan over the presumed rejections of such Classes and the rejection, if any, of any other Class entitled to vote to accept or reject the Plan.

## ARTICLE XII. INJUNCTION AND RELEASES

### A. General Releases by the Non-Debtor Subsidiaries and Holders of Claims Against and Interests in the Debtors of the Debtors, the Non-Debtor Subsidiaries, New Globalstar and its subsidiaries, the Creditors Committee, GTL, and Representatives of the Foregoing

Each (a) Non-Debtor Subsidiary, (b) holder of (i) a Claim (whether or not allowed) against or Interests in a Debtor or (ii) a GLP Partnership Interest and (c) Person (i) voting to accept the Plan on any Ballot or (ii) participating in exchanges and distributions under or pursuant to the Plan, shall release and discharge, absolutely, unconditionally, irrevocably and forever, any and all Claims or Causes of Action arising from the beginning of time through the Effective Date against (i) the Debtors, (ii) the Non-Debtor Subsidiaries, (iii) New Globalstar and its subsidiaries, (iv) the Creditors Committee, (v) GTL, and (vi) the Representatives of any of the foregoing, in any way directly or indirectly relating to or concerning the Debtors, including their management and operations, the Chapter 11 Cases or the Plan; provided, however, that the foregoing shall not operate as a waiver or release from, subject to applicable rights of offset, if any, commercial claims, loans and trade obligations owed to the Debtors or the Non-Debtor Subsidiaries by such Entities. Any Entity acquiring a Claim from an Entity that is bound by the release set forth in this Section XII.A shall be bound by such release as if such acquiring Entity had agreed to be bound to the release with respect to such acquired Claim or Interest. The releases set forth herein shall not apply to (i) Claims or Causes of Action against any entity for their fiduciary obligations, if any, under ERISA, (ii) Securities Litigation Claims against any Securities Litigation Defendant to the extent such Claims are asserted in the Securities Class Action and the holder of any such Securities Litigation Claim is not also a holder of a General Unsecured Claim; provided, however, that such Securities Litigation Claims against GLP or GCC shall be released except to the extent of the treatment provided to such Claims under the Plan, (iii) with respect to the Creditors Committee and Representatives of (a) the Creditors Committee and (b) the Debtors, liability for an act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct, and (iv) the Securities and Exchange Commission with respect to the enforcement of its police and regulatory powers against any non-debtor.

### B. General Releases by Non-Debtor Subsidiaries and Holders of Claims Against and Interests in the Debtors of the Loral Entities and General Partners Committee Releasees

Each (a) Non-Debtor Subsidiary, (b) holder of (i) a Claim (whether or not allowed) against or Interest in a Debtor or (ii) a GLP Partnership Interest, or (c) Person (i) voting to accept the Plan on any Ballot or (ii) participating in exchanges and distributions under or pursuant to the Plan shall release and discharge, absolutely, unconditionally, irrevocably and forever, any Claim or Cause of Action arising from the beginning of time through the Confirmation Date against the Loral Entities or any Representative thereof, or the General Partners Committee Releasees, in any way directly or indirectly relating to or concerning the Debtors, including their management and operations, the Chapter 11 Cases or the Plan (other than (i) Claims arising after the Confirmation Date under any Assumed Contract; (ii) Claims for all sums due in connection with ordinary course postpetition commercial transactions between any Loral Entity and any Globalstar Entity; and/or (iii) Claims arising under the Loral Settlement Agreement). Any Entity acquiring a Claim from an Entity that is bound by this Third Party Release shall be bound by such Third Party Release as if such acquiring Entity had agreed to be bound to the Third Party Release with respect to such acquired Claim or Interest. The releases set forth herein shall not apply to (i) Claims or Cause of Action against any entity for their fiduciary obligations, if any, under ERISA, and (ii) Securities Litigation Claims against any Securities Litigation Defendant to the extent such Claims are asserted in the Securities Class Action and the holder of any such Securities Litigation Claim is not also a holder of a General Unsecured Claim.

- 39 -

### C. General Releases by Non-Debtor Subsidiaries and Holders of Claims Against and Interests in the Debtors of the QUALCOMM Entities and Related Parties

Each (a) Non-Debtor Subsidiary, (b) holder of (i) a Claim (whether or not allowed) against or Interest in a Debtor or (ii) a GLP Partnership Interest, or (c) Person (i) voting to accept the Plan on any Ballot or (ii) participating in exchanges and distributions under or pursuant to the Plan shall release and discharge, absolutely, unconditionally, irrevocably and forever, any Claim or Cause of Action arising from the beginning of time through the Confirmation Date against the QUALCOMM Entities, their subsidiaries, and the Representatives of the foregoing in any way directly or indirectly relating to or concerning the Debtors, including their management and operations, the Chapter 11 Cases or the Plan (other than Claims or Causes of Action arising under the QUALCOMM Settlement Agreement or Claims or Causes of Action that were not released pursuant to the QUALCOMM Settlement Agreement). Any Entity acquiring a Claim from an Entity that is bound by the release set forth in this Section XII.C shall be bound by such release as if such acquiring Entity had agreed to be bound to the release with respect to such acquired Claim or Interest. The releases set forth herein shall not apply to (i) Claims or Cause of Action against any entity for their fiduciary obligations, if any, under ERISA, and (ii) Securities Litigation Claims against any Securities Litigation Defendant to the extent such Claims are asserted in the Securities Class Action and the holder of any such Securities Litigation Claim is not also a holder of a General Unsecured Claim.

### D. General Releases by Non-Debtor Subsidiaries and Holders of Claims Against and Interests in the Debtors of the GP Debtors

Each (a) Non-Debtor Subsidiary, (b) holder of (i) a Claim (whether or not allowed) against or Interest in a Debtor or (ii) a GLP Partnership Interest, or (c) Person (i) voting to accept the Plan on any Ballot or (ii) participating in exchanges and distributions under or pursuant to the Plan shall release and discharge, absolutely, unconditionally, irrevocably and forever, any Claim or Cause of Action arising from the beginning of time through the Confirmation Date against the GP Debtors to the extent based on any GP Debtor being a direct or indirect general partner of the Debtors. Any Entity acquiring a Claim from an Entity that is bound by the release set forth in this Section XII.D shall be bound by such release as if such acquiring Entity had agreed to be bound to the release with respect to such acquired Claim or Interest. The releases set forth herein shall not apply to (i) Claims or Cause of Action against any entity for their fiduciary obligations, if any, under ERISA, and (ii) Securities Litigation Claims against any Securities Litigation Defendant to the extent such Claims are asserted in the Securities Class Action and the holder of any such Securities Litigation Claim is not also a holder of a General Unsecured Claim.

### E. Release by the Debtors of their Representatives, the Creditors Committee and its Representatives, the Loral Entities and their Representatives, the General Partners Committee Members, the GP Debtors, and QUALCOMM and its Representatives

1.      **Each Debtor hereby absolutely, unconditionally, irrevocably and forever releases and discharges its Representatives from any Claim or Cause of Action arising from the beginning of time through the Confirmation Date in any way directly or indirectly relating to or concerning the Debtors, including their management and operations, the Chapter 11 Cases or the Plan, provided, however, that the foregoing shall not operate as a waiver or release (i) from, subject to applicable rights of offset, if any, commercial claims, loans and trade obligations owed to the Debtors, (ii) from any Claim or Cause of Action for which an action has been commenced by the Debtors prior to the Confirmation Date, and (iii) from liability for an act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.**

2.      **Each Debtor hereby absolutely, unconditionally, irrevocably and forever releases and discharges the Creditors Committee and its Representatives from any Claim and/or Cause of Action arising from the beginning of time through the Confirmation Date in any way directly or indirectly relating to or concerning the Debtors, including their management and operations, the Chapter 11 Cases or the Plan, provided, however, that the foregoing shall not operate as a waiver or release (i) from, subject to applicable rights of offset, if any, commercial claims, loans and trade obligations owed to the Debtors, and (ii) from liability for an act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.**

- 40 -

3. **This plan ratifies the Loral Settlement Agreement and the releases granted by the Debtors pursuant to the Loral Settlement Agreement are extended to cover the period from April 14, 2003 through the Confirmation Date, and correspondingly the Loral Entities and GP Debtors shall be deemed to have ratified the Loral Settlement Agreement and the releases granted therein as of the Confirmation Date.**

4. **This Plan ratifies the QUALCOMM Settlement Agreement and the releases granted by the Debtors pursuant to the QUALCOMM Settlement Agreement are extended to cover the period from the date of approval thereof through the Confirmation Date, and, correspondingly, the QUALCOMM Entities shall be deemed to have ratified the QUALCOMM Settlement Agreement and the releases therein as of the Confirmation Date.**

### F. Exculpation

None of the Debtors, their officers, members of the General Partners Committee, the Creditors Committee, or the Representatives of any of the foregoing in such capacity, shall have or incur any liability to any Entity whatsoever, including any holder of any Claim (whether or not allowed) or Interests, or any Entity participating in exchanges and distributions under or pursuant to the Plan, for any act or omission in connection with, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination or confirmation of the Plan, the consummation of the Plan or the administration of the Plan, the Disputed Claims Reserve, or property to be distributed pursuant to the Plan, or any contract, instrument, release or other agreement or document created or entered into, pursuant to or in connection with the Plan; provided, however, that the foregoing provisions of this Section XII.F will have no effect on: (i) the liability of any Entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan; (ii) the liability of any Entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct; and (iii) the Securities and Exchange Commission with respect to the enforcement of its police and regulatory powers against any non-debtor. The releases set forth herein shall not apply to Claims or Cause of Action against any entity for their fiduciary obligations, if any, under ERISA.

In addition to the foregoing, the directors and officers of GCC serving after the Effective Date shall incur no personal liability to any Entity for any act or omission in connection with, or arising out of, their administration of the Plan, or the Disputed Claims Reserve, or any other act or omission in connection with the operation of GCC as set forth in Section IV.A.1(c); provided, that, such directors and officers may be found to be liable for acts or omissions resulting from gross negligence, fraud or willful misconduct. The Bankruptcy Court shall retain exclusive jurisdiction over any action or proceeding commenced against the directors and officers of GCC serving from and after the Effective Date in connection with, arising out of, or related to their service as directors and officers of GCC from and after the Effective Date. No action or proceeding may be commenced against the directors and officers of GCC serving from and after the Effective Date in connection with, arising out of, or related to their service as directors and officers of GCC from and after the Effective Date without the prior approval of the Bankruptcy Court.

### G. Injunction And Stays

### 1. General Injunction Related To Parties Released Pursuant to Plan

Except as otherwise provided in the Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Entities who have held, hold or may hold as of the Confirmation Date any Claims or Causes of Action against any of the Entities released pursuant to the provisions of the Plan (including Sections XII.A, XII.B, XII.C, XII.D XII.E or pursuant to any settlement authorized pursuant to the Plan) are permanently enjoined from and after the Confirmation Date from the prosecution, whether directly, indirectly, derivatively or otherwise, of any such Claim or Causes of Action released, discharged or terminated pursuant to the provisions of the Plan.

- 41 -

## 2.    Injunction Relating to New Globalstar

Except as otherwise provided in the Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Entities who have held, hold or may hold Claims (whether or not allowed) against or Interests or GLP Partnership Interests in any of the Debtors or the Estates are, with respect to any such Claims (whether or not allowed) or Interests or GLP Partnership Interests, permanently enjoined from and after the Confirmation Date from: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting New Globalstar, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, New Globalstar or any property of any such transferee or successor; (b) enforcing, levying, attaching (including any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against New Globalstar or any of its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, New Globalstar, or any property of any such transferee or successor; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the New Globalstar or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, New Globalstar; (d) asserting any right of setoff or subrogation of any kind, directly or indirectly, against any obligation due New Globalstar, any of its property, or any direct or indirect transferee of any property of, or successor in interest to, New Globalstar; and (e) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law, in each case, on account of such Claims or Interest; provided, however, that nothing contained in this Section XII.G.2 shall operate as a release from, or operate as an injunction with respect to, Claims or Causes of Action against New Globalstar in connection with the consummation of the transaction with Thermo or with respect to the New Globalstar LLC Agreement or for fiduciary obligations, if any, under ERISA.

## 3.    Continuation of Stays and Injunctions

Except for the permanent injunctions provided in Sections XII.G.1 and XII.G.2, all injunctions or stays (including those enjoining the prosecution of Claims or Causes of Action belonging to the Debtors or the Estates) provided for in the Chapter 11 Cases pursuant to section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the dissolution of the Debtors.

## 4.    Consent to Injunctions

By accepting distributions pursuant to the Plan, each holder of an Allowed Claim receiving distributions pursuant to the Plan will be deemed to have specifically consented to the injunctions set forth in this Section XII.G. to the extent that such consent is necessary.

## 5.    Indemnity

Nothing contained in the Plan shall prohibit or in any manner limit the right or ability of any of the Debtors' officers, directors and members of the General Partners Committee to enforce his, her, their or its rights against the insurer under any and all applicable policies of insurance (whether such policies were arranged and paid for by the Debtors or by any Entity or otherwise) and any and all such rights shall be and hereby are expressly preserved (i) to the extent of available insurance coverage and (ii) for purposes of defense and offset against any claims asserted against such officers, directors and members of the General Partners Committee; provided, however, that such directors, officers and members of the General Partners Committee shall have no right to any affirmative recovery from the Debtors on account of indemnification claims that are not Allowed Claims as of the Effective Date of the Plan.

## H.    Termination of Subordination Rights and Settlement of Related Claims and Controversies

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract,

- 42 -

section 510 of the Bankruptcy Code or otherwise, that a holder of a Claim or Interest may have against other Claim or Interest holders with respect to any distribution made pursuant to the Plan.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the subordination rights that a holder of a Claim may have with respect to any Allowed Claim or any distribution to be made pursuant to the Plan on account of any Allowed Claim. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors and their respective property and Claim and Interest holders and is fair, equitable and reasonable.

## ARTICLE XIII. RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain such jurisdiction over the Chapter 11 Cases after the Effective Date as is legally permissible, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim; the resolution of any objections to the allowance, priority or classification of Claims or Interests; the resolution, and distributions from the Disputed Claims Reserve to holders, of Disputed Claims; and the approval of the Indenture Trustee's fees and expenses pursuant to Section III.A;

2.      Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

3.      Resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

4.      Ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, including the Causes of Actions and Recovery Actions to the extent not released hereunder, and grant or deny any applications involving the Debtors that may be pending on the Effective Date or brought thereafter;

6.      Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement, the Confirmation Order, the Loral Settlement Agreement, the QUALCOMM Settlement Agreement or the Asset Contribution Agreement;

7.      Resolve any cases, controversies, suits or disputes that may arise in connection with the Causes of Actions and Recovery Actions or the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

8.      Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other

- 43 -

agreement or document entered into, delivered or created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

9.      Issue injunctions, enforce the injunctions and releases contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

10.      Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or distributions pursuant to the Plan are enjoined or stayed;

11.      Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

12.      Determine matters concerning state, local and federal Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for Taxes;

13.      To hear and determine all applications for award of compensation for services rendered by Professionals and reimbursement of such Professional's expenses relating to such services rendered and to resolve disputes relating to the payment by the Debtors of compensation for services rendered by Professionals and reimbursement of such Professional's expenses for post-Confirmation Date periods;

14.      To hear and determine any disputes arising in connection with the interpretation, implementation or enforcement of this Plan;

15.      To hear and determine any other matter not inconsistent with the Bankruptcy Code; and

16.      To enter a final decree closing the Chapter 11 Cases.

## ARTICLE XIV. MISCELLANEOUS PROVISIONS

### A.      Dissolution of the Creditors Committee

Except as otherwise provided in the Plan, effective 30 days after the Effective Date if no appeal is then pending, the Creditors Committee shall cease to exist, and its members and employees or agents (including, without limitation, attorneys, investment bankers, financial advisors, accountants and other professionals) will be released and discharged from any further authority, duties, responsibilities and obligations relating to, arising from, or in connection with their service on the Creditors Committee. The Creditors Committee will continue to exist after such date solely with respect to (a) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code seeking payment of fees and expenses incurred by any professional, including objections and appeals therefrom, (b) any post-confirmation modifications to, or motions seeking the enforcement of, the Plan or the Confirmation Order and (c) any matters pending as of the Effective Date in the Chapter 11 Cases, until such matters are finally resolved.

### B.      Modification of the Plan

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code, upon not less than ten days' prior written notice to the Creditors Committee, the Debtors reserve the right to alter, amend or modify the Plan before its substantial consummation; provided that no alteration, amendment or modification of the Plan that may have a material adverse effect on the rights of the unsecured creditors or that reflects a change in the financial aspects of the transaction contemplated hereby may occur without the written consent of the Creditors Committee until the Creditors Committee is dissolved in accordance with Article XIV.A hereof, except that the written consent of the Creditors Committee shall not be required for any alteration, amendment or modification of

- 44 -

the Plan that relates in any manner to the Standard Release-Based Consideration or the Supplemental Release-Based Consideration or any dispute with respect thereto.

## C. Revocation of the Plan

The Debtors reserve the right to revoke or withdraw the Plan as to any or all of the Debtors prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan as to any or all of the Debtors, or if Confirmation as to any or all of the Debtors does not occur, then, with respect to such Debtors, the Plan will be null and void in all respects, and nothing contained in the Plan will: (1) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or (2) prejudice in any manner the rights of any Debtors or any other party.

## D. Severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision then will be applicable as altered or interpreted; provided that any such alteration or interpretation must be in form and substance acceptable to the Debtors and the Creditors Committee (except that such alteration or interpretation relating to the Standard Release-Based Consideration or the Supplemental Release-Based Consideration or any dispute with respect thereto need not be acceptable to the Creditors Committee). Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## E. Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity, including New Globalstar.

## F. Applicability of Section 1145

1. Pursuant to section 1125(e) of the Bankruptcy Code, the Debtors' transmittal of solicitation materials, their solicitation of acceptances of the Plan and their offering and distribution of the Membership Interests, the Series A Rights, and the Series B Rights pursuant to the Plan are not, and will not be, governed by or subject to any otherwise applicable law, rule or regulation governing the solicitation of acceptance of a plan of reorganization or the offer, issuance, sale or purchase of securities.

2. Pursuant to section 1145(a)(1) of the Bankruptcy Code, the offering and distribution of the Membership Interests, the Series A Rights, and the Series B Rights pursuant to the Plan in respect of Claims are, and will be, exempt from section 5 of the Securities Act and any state or local law requiring registration for offer or sale of a security or registration or licensing of an issuer or underwriter of, or broker or dealer in, a security.

3. Pursuant to, and to the fullest extent permitted under, section 1145 of the Bankruptcy Code, the resale of any security referenced in Section XIV.F.2 (and the distribution of any Membership Interest pursuant to the Series A Rights, and the Series B Rights ) will be exempt from section 5 of the Securities Act and any state or local law requiring registration for offer or sale of a security or registration or licensing of an issuer or underwriter of, or broker or dealer in, a security.

## G. Service of Documents

- 45 -

Any pleading, notice or other document required by the Plan or Confirmation Order to be served on or delivered to the Debtors, the Creditors Committee, or the United States Trustee must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

> 1. The Debtors:
> Globalstar, L.P.
> P.O. Box 640670
> San Jose, California 95164-0670
> Attention: William Adler, Esq.
> Fax: (408) 933-4950
>
> Jones Day
> Attorneys for the Debtors
> 222 E. 41st Street
> New York, New York 10017
> Attention: Paul D. Leake, Esq.
> Fax: (212) 755-7306
>
> Young Conaway Stargatt & Taylor LLP
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, Delaware 19899
> Attention: Brendan Linehan Shannon, Esq.
> M. Blake Cleary, Esq.
> Fax: (302) 856-9338
>
> 2. The Creditors Committee:
> Akin Gump Strauss Hauer & Feld, LLP
> Attorneys for The Official Committee of Unsecured Creditors
> 590 Madison Avenue
> New York, NY 10022
> Attention: Daniel H. Golden, Esq.
> Fax: (212) 872-1002
>
> 3. The United States Trustee:
> Office of the United States Trustee
> 844 King Street, Suite 2313
> Wilmington, Delaware 19801
> Attention: Mark S. Kenney, Esq.

NYI-2137801v5
WP3:998520 5

61600.1001

Dated: June *17*, 2004

Respectfully submitted,

Globalstar, L.P. (for itself and on behalf of the GLP
Subsidiary Debtors)

By: _____
    Name: William F. Adler
    Title: Vice President - Legal & Regulatory Affairs

COUNSEL:

Brendan Linehan Shannon (No. 3136)
M. Blake Cleary (No. 3614)
YOUNG CONAWAY STARGATT & TAYLOR LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19899
(302) 571-6600

     and -

Paul D. Leake
Scott J. Friedman
JONES DAY
222 E. 41st Street
New York, NY 10017
(212) 326-3939

ATTORNEYS FOR DEBTORS AND DEBTORS IN
POSSESSION

NYI-2124671v11
WP3:998520.5

61600.1001

# EXHIBIT B

## CONFIRMATION NOTICE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

IN RE:

**GLOBALSTAR CAPITAL CORPORATION,**
    **a Delaware corporation, _et al._,**

       **Debtors.**

**(GLOBALSTAR CAPITAL CORPORATION)**
**(GLOBALSTAR SERVICES COMPANY, INC.)**
**(GLOBALSTAR (DEBTOR), LLC)**
**(GLOBALSTAR, L.P.)**

**Jointly Administered**
**Case No. 02-10499 (PJW)**

**Chapter 11**

**(Case No. 02-10499 (PJW))**
**(Case No. 02-10501 (PJW))**
**(Case No. 02-10503 (PJW))**
**(Case No. 02-10504 (PJW))**

## NOTICE OF (A) ENTRY OF ORDER CONFIRMING THE DEBTORS' FIRST MODIFIED FOURTH AMENDED JOINT PLAN UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, (B) OCCURRENCE OF THE EFFECTIVE DATE, (C) DEADLINE TO FILE PROOF OF CERTAIN REJECTION DAMAGE CLAIMS AND (D) DEADLINE TO FILE PROOF OF CERTAIN ADMINISTRATIVE CLAIMS

**PLEASE TAKE NOTICE THAT:**

1.      <u>Confirmation of the Plan</u>. On June [__], 2004 (the "Confirmation Date"), the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") entered the Order Confirming the Debtors' First Modified Fourth Amended Joint 11 Plan under Chapter 11 of the Bankruptcy Code (D.I. _____) (the "Confirmation Order"). The Confirmation Order confirms the Debtors' First Modified Fourth Amended Joint First Modified Fourth Amended Joint 11 Plan Under Chapter 11 of the Bankruptcy Code under Chapter 11 of the Bankruptcy Code dated June 1_, 2004 (D.I. _____) (the "Plan") proposed by Globalstar, L.P., Globalstar Capital Corporation, Globalstar Services Company, Inc., and Globalstar (Debtor), LLC f/k/a Globalstar, L.L.C., (collectively, the "Debtors" or "Globalstar"). The Confirmation Order (including the Plan attached as <u>Exhibit A</u> thereto) is on file with the Bankruptcy Court and may be reviewed during regular Bankruptcy Court hours. Except as otherwise provided in the Confirmation Order or the Plan, as of the Effective Date[1] of the Plan, (a) the provisions of the Plan are binding upon the Debtors, any entity acquiring property under the Plan and any creditor or Interest holder of the Debtors, whether or not the Claim or Interest of such creditor or Interest holder is impaired under the Plan and whether or not such creditor or Interest holder has accepted the Plan, and (b) all Entities who have held, hold or may hold any Claims or Causes of Action against any of the Entities released pursuant to the Plan are permanently enjoined from and after the Confirmation Date from the prosecution, whether directly, indirectly, derivatively or

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

otherwise, of any such Claim or Cause of Action. As of the Effective Date of the Plan or such later date as provided for in the Plan or the Confirmation Order, the Senior Notes, the Senior Note Indentures, any vendor financing agreements, any credit facility and any other prepetition debt instruments, the GLP Partnership Interests and Interests in the GLP Subsidiary Debtors will be canceled.

2.               <u>Effective Date</u>. The Effective Date of the Plan occurred on June ___, 2004.

3.               <u>Executory Contracts and Unexpired Leases; Bar Date</u>. As set forth in the Plan, all Executory Contracts and Unexpired Leases are deemed rejected except for those contracts or leases that were previously assumed or rejected pursuant to an order of the Bankruptcy Court or are the subject of a motion to assume or reject such contract or lease filed prior to the Confirmation Date.

              Claims arising out of the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan must be filed with Robert L. Berger & Associates, LLC, PMB 1014, 10351 Santa Monica Blvd., Suite 101A, Los Angeles, CA 90025 no later than 4:00 pm EST, on _____, 2004, the date that is thirty (30) days after the Confirmation Date. Any Claims not filed within such applicable time periods will be forever barred from receiving a distribution from the Estates.

4.               <u>Fee Applications</u>. On or before the sixtieth (60th) day after the Effective Date, all applications (the "Final Fee Applications") for final allowances of compensation of a Professional or other entity for services rendered or expenses incurred in the Chapter 11 Cases through and including the Effective Date pursuant to sections 330(a), 331, 503 or 1103 of the Bankruptcy Code must be filed with the Bankruptcy Court, together with proof of service thereof, and served on (a) Jones Day, Co-Attorneys for the Debtors, 222 E. 41st Street, New York, New York 10017, Attention: Paul D. Leake, Esq.; (b) Young Conaway Stargatt & Taylor LLP, Co-Attorneys for the Debtors, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, Delaware 19899, Attention: Brendan Linehan Shannon, Esq., M. Blake Cleary, Esq.; (c) Akin, Gump, Strauss, Hauer & Feld, L.L.P., Attorneys for the Committee, 590 Madison Avenue, New York, New York 10022, Attention: Daniel H. Golden; and (d) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2313, Wilmington, Delaware 19801, Attention: Mark S. Kenney, Esq.

              The hearing (the "Final Fee Hearing") on the Final Fee Applications has been scheduled to take place before the Honorable Peter J. Walsh, United States Bankruptcy Court Judge, at the United States Bankruptcy Court for the District of Delaware, 844 Market Street - Sixth Floor, Wilmington Delaware 19801 on _____, 2004 at _____. The Final Fee Hearing may be adjourned without further notice other than announcement at the Final Fee Hearing or at an adjourned Final Fee Hearing. Objections, if any, to any Final Fee Applications shall be filed with the Court, together with proof of service thereof, and served upon the applicant and the parties identified in the preceding paragraph of this notice, so as to be received not later than the date that is twenty (20) days after the Final Fee Application is filed and served.

5.       Administrative Bar Date. Except as otherwise provided for in the Confirmation
Order, pursuant to the Confirmation Order, all Entities (including individuals,
corporations, partnerships, estates, trusts, and governmental units) holding Administrative
Claims against the Debtors must file a request for allowance of such Administrative
Claims no later than _____, 2004. Such a request must be filed with Robert L.
Berger & Associates, LLC, PMB 1014, 10351 Santa Monica Blvd., Suite 101A, Los
Angeles, CA 90025 and the Bankruptcy Court. All requests for allowance of
Administrative Claims must be submitted in a form in accordance with the Bankruptcy
Code and the Bankruptcy Rules. SHOULD YOU FAIL TO FILE A TIMELY
REQUEST FOR ALLOWANCE OF AN ADMINISTRATIVE CLAIM, SUCH CLAIM
WILL NOT BE ALLOWED BY THE BANKRUPTCY COURT OR PAID BY THE
DEBTORS.

Dated:      Wilmington, Delaware
            _____, 2004

                              Brendan Linehan Shannon (DE 3136)
                              M. Blake Cleary (DE 3614)
                              YOUNG CONAWAY STARGATT &
                              TAYLOR LLP
                              The Brandywine Building
                              1000 West Street, 17th Floor
                              Wilmington, Delaware 19899
                              (302) 571-6600

                              - and -

                              Paul D. Leake
                              Scott J. Friedman
                              JONES DAY
                              222 E. 41st Street
                              New York, New York 10017
                              (212) 326-3939

                              ATTORNEYS FOR DEBTORS AND
                              DEBTORS IN POSSESSION